### Dan RANDALL, Plaintiff,

v.

### BUENA VISTA COUNTY HOSPITAL, James O. Nelson, Individually and as Administrator of the Buena Vista County Hospital, Buena Vista Clinic Foundation, and Darrell Pritchard, Individually and as Administrator of the Buena Vista Clinic Foundation, Defendants.

### No. C 98–3018–MWB.

United States District Court,
N.D. Iowa,
Central Division.

Nov. 19, 1999.

Blake Parker, Blake Parker Law Office, Fort Dodge, IA, for plaintiff.

Michael W. Ellwanger, Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser, L.L.P., Sioux City, IA, for defendants.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ................................................. 949
 A. Procedural Background ................................... 949
 B. Factual Background ...................................... 950

II. LEGAL ANALYSIS .............................................................951
 A. Standards For Summary Judgment......................................951
 B. The Constitutional Claim ...........................................952
 1. The parties' arguments .........................................952
 2. A protected interest............................................953
 a. Property interest...........................................953
 b. Liberty interest ...........................................955
 C. The Sherman Act Claim..............................................957
 1. The parties' arguments .........................................957
 2. Prohibitions of the Sherman Act ................................958
 3. Elements of the claim ..........................................958
 4. Exclusive contracts and "tying".................................959
 5. "Group boycott" ................................................963
 D. Wrongful Discharge ................................................966
 1. The parties' arguments .........................................966
 2. Contract employee..............................................966
 3. Public policy exception ........................................967
 4. Handbook exception ............................................968

III. CONCLUSION .................................................................970

Was the plaintiff discharged from his contracts with a public hospital and a medical clinic in violation of his constitutional and common-law rights and the prohibitions of federal antitrust law? The plaintiff's wide-ranging assertions that he was wrongfully discharged are challenged in the defendants' motion for summary judgment presently before the court.

## I. INTRODUCTION

### A. Procedural Background

Plaintiff Dan Randall, a Certified Registered Nurse Anesthetist (CRNA), filed this lawsuit on February 19, 1998, against defendants Buena Vista County Hospital (the Hospital) and Buena Vista Clinic Foundation (the Clinic Foundation), alleging that his contract with each institution had been wrongfully terminated in mid–1996. Randall named as additional defendants James O. Nelson, the Administrator of the Hospital, and Darrell Pritchard, the Administrator of the Clinic Foundation.

In his Complaint, Randall asserts three claims arising from the termination of his contracts with the two institutions. In his first cause of action, Randall asserts a claim pursuant to 42 U.S.C. § 1983 that the Hospital, "by and through James O. Nelson," discharged Randall as a CRNA "without cause" in violation of his rights to

equal protection and due process, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. Specifically, Randall alleges that the Hospital deprived him of his property interest in his public employment position without due process. In his second cause of action, Randall alleges that "[a]ll defendants" conspired to create an agreement or contract in restraint of trade that would preclude Randall from practicing as a CRNA at the Buena Vista County Hospital in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. For his third cause of action, Randall asserts a common-law claim that the "defendants" wrongfully discharged him contrary to the stated public policy of Iowa Code § 20.7(3) and/or the rights guaranteed him by the personnel policies of the Hospital and Clinic Foundation. Randall seeks compensatory and punitive damages, costs, and attorneys fees.

The defendants answered the Complaint on May 19, 1998, asserting, *inter alia*, an affirmative defense that Randall was improperly splitting his cause of action between the present lawsuit and an action filed in Iowa District Court for Buena Vista County. On September 14, 1998, however, this court granted Randall's motion to strike the defendants' affirmative defense. The court concluded that the acts complained of, and the recovery de-

manded, in Randall's federal lawsuit were not the same as those found in Randall's state-court action.

On August 23, 1999, the defendants mounted another challenge to Randall's claims by filing the motion for summary judgment that is presently before the court. In that motion, the defendants seek summary judgment on all three of Randall's claims on various grounds. Randall resisted the motion on October 8, 1999. Neither party requested oral arguments on the motion for summary judgment and the court has therefore considered the motion on the record and written arguments presented.

### B. Factual Background

The court will discuss here only the nucleus of undisputed facts pertinent to the present motion for summary judgment. In its legal analysis, the court will address where necessary Randall's assertion of genuine issues of material fact that may preclude summary judgment on his claims.

Mr. Randall, a Certified Registered Nurse Anesthetist (CRNA), originally provided anesthesia services at the Hospital pursuant to an Anesthesia Services Agreement, which became effective July 15, 1991. The contract provided that Randall was an "independent provider of professional anesthesia services, and nothing in this Agreement shall constitute or be construed in any manner so as to create an employment relationship or an agency, partnership or joint venture relationship between Hospital and Anesthetist." Appendix To Defendants' Motion For Summary Judgment, Deposition Exhibit No. 3, Anesthesia Services Agreement of July 15, 1991 (Randall's Anesthesia Services Agreement), Art. VI. Randall was also admitted as an Allied Health Professional (AHP) with clinical privileges at the Hospital.

Randall originally practiced with another CPNA, Jerry McMichael, in a business named Anesthesia Associates. McMichael and Randall shared the work at the Hospital and split the fees evenly between them. An entity called the Buena Vista Clinic provided billing services for McMichael and Randall and was paid 15% of fees billed for doing so. The Buena Vista Clinic, which operated a family practice office in Storm Lake, Iowa, was a separate entity from the Hospital. The Buena Vista Clinic later incorporated as the defendant Buena Vista Clinic Foundation (the Clinic Foundation).

In August of 1995, Randall and McMichael became employees of the Clinic Foundation. Randall entered into a Professional Employment Contract with the Clinic Foundation, effective August 21, 1995. This Professional Employment Contract required, *inter alia*, that Randall obtain and maintain good standing membership on the AHP staff at the Hospital with appropriate clinical privileges. Mr. Randall understood that the change in employment status would mean that the CRNAs would be better able to set up retirement plans and to obtain access to other employment benefits. However, Randall did not terminate his independent contract with the Hospital at the time he became an employee of the Clinic Foundation.

Randall's professional and personal relationship with McMichael became strained during 1995 and 1996. Each apparently made complaints about the professional competence of the other to the Clinic Foundation and the Hospital. Various meetings were held involving Mr. Nelson, Mr. Pritchard, McMichael, and Randall during the summer of 1995. Randall was apparently informed at about this time that he would not have a leadership role in the anesthesia department of the Hospital. In August of 1995, another CRNA, John Peters, also began providing anesthesia services at the Hospital, also as an independent service provider. Mr. Peters also expressed personal and professional concerns about working with Randall.

At some time in 1995 or 1996, the Hospital and Clinic Foundation began negotiating, and possibly operating under, an agreement pursuant to which the Clinic

Foundation would provide services of CRNAs to the Hospital. A formal, written Anesthesia Services Agreement to that effect was eventually executed on July 1, 1996. Pursuant to the July 1, 1996, agreement, the Clinic Foundation was to provide professional anesthesia services "on an exclusive basis." On April 30, 1996, prior to execution of the exclusive provider agreement between the Clinic Foundation and the Hospital, the Hospital sent all three CRNAs—Randall, McMichael, and Peters—official 60-day notices of the termination of their individual Anesthesia Services Agreements. On April 28, 1996, two days prior to the date on which the Hospital sent the three CRNAs notice of the termination of their individual Anesthesia Services Agreements, Mr. McMichael, who was suffering from cancer, advised Mr. Nelson by letter that he was terminating his contract to provide anesthesia services to the Hospital effective that day, stating that his "reasons for termination are health related—and in my best interest."

On May 28, 1996, at a meeting in Mr. Nelson's office, at which Nelson, Pritchard, Peters, and Randall were present, Nelson reiterated that Randall's contract would not be renewed and informed Randall that his AHP privileges would also be withdrawn. Nelson confirmed these decisions in a letter dated May 30, 1996, which again stated that Randall's anesthesia contract with the Hospital would not be renewed, effective July 1, 1996, "without cause," that "a business decision had been made to make a change," and that Randall's AHP privileges "would be null and void by contract terms." At the same meeting on May 28, 1996, Pritchard also informed Randall that his employment contract with the Clinic Foundation would be terminated effective August 21, 1996. Randall later received a written Notice of Nonrenewal of Professional Employment Agreement from Pritchard, dated May 29, 1996, which officially notified Randall that his contract with the Clinic Foundation would not be renewed and would accordingly expire on August 21, 1996.

On June 23, 1996, Randall filed an application with the Hospital for "Allied Health Credentialing Temporary Privileges." On July 16, 1996, Nelson notified Randall in writing that his application for temporary privileges would not be submitted for credentialing, because his Anesthesia Services Agreement indicated that AHP privileges would not survive termination of the Agreement. In his letter of July 16, 1996, Nelson also cited the agreement the Hospital had entered into with the Clinic Foundation for exclusive provision of professional anesthesia services at the Hospital as the basis for no longer granting CRNAs privileges on an independent-contractor basis.

Randall subsequently obtained employment as a CRNA in Fort Dodge, Iowa, although he was terminated from that position in 1998 after approximately two-and-one-half years.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

On the defendants' motion for summary judgment, the undisputed facts recounted above as well as the parties' factual disputes must be viewed through the lens of Rule 56 of the Federal Rules of Civil Procedure. This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Rule 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo*, 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.*, 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill*, 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.*, 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997); *Tralon Corp. v. Cedarapids, Inc.*, 966 F.Supp. 812, 817–18 (N.D.Iowa 1997); *Security State Bank v. Firstar Bank Milwaukee, N.A.*, 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.*, 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it

to say that Rule 56 itself provides, in pertinent part, as follows:

> Rule 56. Summary Judgment
>
> (b) For Defending Party. A party against whom a claim . . . is asserted . . . may, at any time, move for summary judgment in the party's favor as to all or any part thereof.
>
> (c) Motions and Proceedings Thereon. . . . *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED.R.CIV.P. 56(b) & (c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Ra-* *dio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel*, 953 F.2d at 394.

With these standards in mind, the court turns to consideration of the parties' arguments for and against summary judgment in this case.

### B. The Constitutional Claim

### 1. The parties' arguments

In the defendants' motion, the Hospital asserts that it is entitled to summary judgment on Randall's first cause of action on several grounds.[1] First, the Hospital argues that the undisputed record shows that Randall was never an employee of the Hospital, but was instead an independent contractor. Consequently, the Hospital argues that Hospital personnel policies have no relation to the termination of Randall's contract with the Hospital, be-

---

**1.** To the extent Randall has attempted to name Nelson as a defendant on this cause of action—because he alleged that the Hospital, "by and through James O. Nelson," discharged Randall as a CRNA "without cause" in violation of his rights to equal protection and due process, *see* Complaint, ¶ 20—the court finds that the grounds for summary judgment asserted by the Hospital apply equally to Nelson. However, the court cannot find that Randall has asserted any constitutional claim against the other defendants, the Clinic Foundation and Pritchard. The allegations of elements of the claim in Randall's first cause of action all identify "Defendant Buena Vista County Hospital" or "the hospital" as the actor. *See* Complaint, ¶¶ 20 (discharge of Randall by the Hospital "by and through" Nelson), 21 (the Hospital acted under color of state law), 22 (the Hospital had no proper reason for discharge and acted "contrary to the notion of due process"), 23 (the Hospital failed to provide Randall with equal protection and due process), 24 (the Hospital discharged Randall without due process thus depriving him of his property interest in public employment), and 25 (the Hospital acted with malice and reckless disregard to Randall's civil rights). There is no specific reference in this count to conduct of the Clinic Foundation or Pritchard. The reallegation in this cause of action of facts stated in paragraphs one through eighteen of the Complaint, *see id.* at ¶ 19, also does not indicate that Randall is attempting to assert a constitutional claim against either Pritchard or the Clinic Foundation, when the only defendant specifically asserted to have violated Randall's constitutional rights is the Hospital. Instead, paragraph 19 simply reiterates the factual context for the constitutional claim against the Hospital and/or Nelson. Therefore, the court will not address the defendants' arguments for summary judgment on the constitutional claim against Pritchard and the Clinic Foundation, because there is no such claim against those defendants.

cause the only rules governing termination of the contract are in the contract itself. The contract, the Hospital argues further, could be terminated without cause, either before automatic renewal, or at will during its term, upon sixty days' written notice. The Hospital asserts that it gave Randall timely notice of the termination of the contract more than sixty days before the end of its term. Consequently, the Hospital asserts that Randall had no property or liberty interest in his contract with the Hospital to which due process protections could apply.

Randall counters that his AHP privileges were terminated in violation of the Hospital's Bylaws of the Medical Staff and that his contract was terminated without any notice or meaningful opportunity to be heard prior to the adverse action. He asserts that, in the circumstances, he was "clearly" entitled to a pre-termination "name-clearing" hearing. He points out that, although he was told at the time that the termination of his contract and his AHP privileges was a "business decision," the first "whisper" he had that the decision was based on his professional competence was in the course of this litigation. He also contends that he was entitled to a post-termination grievance procedure as outlined in the Bylaws, but that he was never given forms or a forum for any grievance. Furthermore, he points out that his application for temporary AHP privileges was summarily denied. Finally, he contends that, as a public employee, he had a liberty interest in his good name, reputation, and integrity, which has now been impinged upon by the Hospital's assertions that his termination was on the basis of professional competence.[2]

2. Randall does not argue in his resistance to the summary judgment motion that he was deprived of equal protection of the law, *i.e.,* that he was treated differently from similarly situated individuals owing to a racial or other class-based animus, although he makes a passing reference to deprivation of equal protection in his Complaint. *See* Complaint, ¶ 23 ("Defendant Buena Vista County Hospital failed to provide plaintiff the equal protection

### 2. A protected interest

As the Eighth Circuit Court of Appeals recently explained, " 'To set forth a procedural due process violation, a plaintiff, first, must establish that his protected liberty or property interest is at stake.' " *Spitzmiller v. Hawkins,* 183 F.3d 912, 915 (8th Cir.1999) (quoting *Gordon v. Hansen,* 168 F.3d 1109, 1114 (8th Cir.1999) (*per curiam* )); accord *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Graning v. Sherburne County,* 172 F.3d 611, 616 (8th Cir.1999) ("A state employee is entitled to a hearing or some related form of due process before being deprived of a constitutionally protected property or liberty interest.") (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)); *Johnson v. City of West Memphis,* 113 F.3d 842, 843 (8th Cir.1997) ("The Due Process Clause requires the government to provide an employee with procedural due process if the employee stands to lose a constitutionally protected property or liberty interest.") (also citing *Roth,* 408 U.S. at 569–70, 92 S.Ct. 2701). In his resistance to the defendants' motion for summary judgment, Randall asserts that he has both a protected property interest in his employment and a protected liberty interest in his professional reputation upon which his due process claim is based.

### a. Property interest

 When a public employee asserts a protected property interest in his or her employment, the public employee must show that the protected property interest is derived from a source such as state law, which requires a showing that the employ-

and due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution; and 42 U.S.C. § 1983."). Because Randall has ignored any "equal protection" claim, while arguing strenuously for the sufficiency of his "due process" claim, the court understands Randall to be asserting only a "due process" constitutional claim in his first cause of action in this litigation.

ee could have been fired only for good cause. *Spitzmiller*, 183 F.3d at 915–16; *Johnson*, 113 F.3d at 843 ("For a property interest to exist, the public employee must have a legitimate claim of entitlement to continued employment."). While a public employee with a protected property interest in continued employment is entitled to due process before termination, *see Graning*, 172 F.3d at 616; *Wallin v. Minnesota Dep't of Corrections*, 153 F.3d 681, 690 (8th Cir.1998), *cert. denied*, ―― U.S. ――, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999),[3] where the claimant can show only that he or she was an at-will employee, the claimant lacks the necessary property interest in his or her employment. *Spitzmiller*, 183 F.3d at 916; *Johnson*, 113 F.3d at 843 (the plaintiff "lacked a property interest because he was not entitled to continued employment as the utility commission's general manager," but instead "was an at-will employee who could be terminated at any time without cause").

 It cannot be disputed that Randall's Anesthesia Services Agreement, which became effective July 15, 1991, clearly provided that he was an independent contractor, not an employee of the Hospital. The contract provided that Randall was an "independent provider of professional anesthesia services, and nothing in this Agreement shall constitute or be construed in any manner so as to create an employment relationship or an agency, partnership or joint venture relationship between Hospital and Anesthetist." Randall's Anesthesia Services Agreement, Art. VI. However, leaving

aside the question of whether or not Randall can establish that he was an employee of the Hospital notwithstanding this term of his contract, and the alternative question of whether an independent contractor can have a property interest in continuing employment, it is clear that Randall's Anesthesia Services Agreement was terminable *at-will,* and thus could provide him with no property interest in continued employment. *See Spitzmiller*, 183 F.3d at 915–16 (a property interest in employment requires a showing that the employee could only be terminated for cause); *Johnson*, 113 F.3d at 843 (same). Although his agreement with the Hospital provided that it renewed automatically for successive one year terms, in the absence of notice to terminate at least sixty days prior to the end of the term, *see* Anesthesia Services Agreement, Art. VII(1), Randall's Anesthesia Services Agreement also expressly provided for termination at will during its term as follows:

VII. TERM AND TERMINATION

\*　　\*　　\*　　\*　　\*　　\*

2. This Agreement may be terminated *without cause by either party at any time* during the term of this Agreement by providing written notice to the other party at least sixty (60) days prior to the effective date of the intended termination. The notice of termination provision in the preceding sentence shall not apply, however, in the event of termination "for cause."

*Id.* at Art. VII(2) (emphasis added). Because it is undisputed that the contract

---

**3.** In *Graning*, the court explained that "[a] public employee with a protected property interest in continued employment receives due process if there is notice and an opportunity to respond to charges of misconduct before her termination and if posttermination administrative review procedures are available." *Graning*, 172 F.3d at 616. The purpose of the pretermination hearing is to provide " 'an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.' "

*Wallin*, 153 F.3d at 690 (quoting *Loudermill*, 470 U.S. at 545–46, 105 S.Ct. 1487). However, "[t]he pretermination process need not be elaborate, especially if there are meaningful postdeprivation procedures." *Graning*, 172 F.3d at 616 (citing *Loudermill*, 470 U.S. at 542–47, 105 S.Ct. 1487). Furthermore, the hearing need not precede the *decision* to terminate the employee; rather, it must only precede the termination of the employee's benefits. *See Jackson v. St. Joseph State Hospital*, 840 F.2d 1387, 1391 (8th Cir.), *cert. denied*, 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988).

was terminable *without cause* upon sixty days notice at any time during its term, Randall's contract with the Hospital does not provide the basis for any protected property interest in continued employment to which due process rights could attach. *Compare Spitzmiller*, 183 F.3d at 915–16 (a protected property interest in employment requires a showing that the employee could have been fired only for good cause); *Johnson*, 113 F.3d at 843 ("For a property interest to exist, the public employee must have a legitimate claim of entitlement to continued employment.").

Nor can the court find that Randall has generated a genuine issue of material fact that he had a property interest in continued employment arising from the terms of his AHP Agreement with the Hospital. Randall argues that his AHP privileges were terminated in violation of the Hospital's Bylaws of the Medical Staff, because those Bylaws provide, in Article 5.7, for a written grievance procedure for review of actions taken against a member of the AHP staff, *see* Plaintiff's Statement Of Contested Facts In Response To Defendants' Motion For Summary Judgment, Exhibit A, Bylaws Of The Medical Staff Of Buena Vista County Hospital (Bylaws), p. 22, yet he was denied access to such a grievance procedure.

However, as a matter of law, Randall cannot rely on the grievance provisions for AHPs in the Bylaws as establishing a property right in continued employment. Randall's Anesthesia Services Agreement specifically states the following in the article concerning termination:

> 4. In no case shall clinical privileges or staff appointment survive the termination of this Agreement, *nor shall termination of privileges pursuant to termination of the contract entitle Anesthetist to any hearing and appeal procedure not specifically provided for herein.* Specific contractual terms shall in all cases be controlling in the event that they conflict with provisions in the hospital bylaws or medical staff bylaws.

Randall's Anesthesia Services Agreement, Art. VII(4) (emphasis added). Thus, under this term of his Agreement, the provisions of the Bylaws on which Randall relies are inapplicable to him and his AHP privileges could not "survive" the termination of his Anesthesia Services Agreement. *Id.* Furthermore, the "appeal" provisions of the Agreement are controlling over the grievance provisions of the Bylaws upon which Randall relies. *Id.* The Agreement provides no appeal provisions for a "without cause" termination.

Thus, Randall has failed to generate any genuine issue of material fact that he has a protected property interest in his "employment" with the Hospital. *See* FED.R.CIV.P. 56(c) (summary judgment is appropriate if there is no genuine issue of material fact). Lacking such a protected property interest, his due process claim based on a protected property interest must fail. *See Spitzmiller*, 183 F.3d at 915 (" 'To set forth a procedural due process violation, a plaintiff, first, must establish that his protected liberty or property interest is at stake.' ") (quoting *Gordon*, 168 F.3d at 1114); *accord Roth*, 408 U.S. at 569, 92 S.Ct. 2701; *Graning*, 172 F.3d at 616; *Johnson*, 113 F.3d at 843. The Hospital is therefore entitled to summary judgment on that part of Randall's due process claim founded on a protected property interest.

### b. Liberty interest

■ Randall also contends that he had a protected liberty interest that was violated by the Hospital. "An employee's liberty interests are implicated when, in connection with the employee's discharge, a government official makes accusations that seriously damage the employee's standing in the community or foreclose other employment opportunities." *Johnson*, 113 F.3d at 843. "A public employee is [therefore] entitled to notice and a name-clearing hearing when fired under circumstances imposing a stigma on her professional reputation." *Graning*, 172 F.3d at 616. However, no liberty interest is implicated

if there are no public accusations that would "stigmatize" the employee. *See Johnson*, 113 F.3d at 844 (there had been no public accusations stigmatizing the employee, and hence no liberty interest was implicated, when the public comment of a councilwoman simply expressed her view that it was inappropriate for the utility commission to do construction work on private property).

The Eighth Circuit Court of Appeals acknowledged some time ago that there is "a line of public employee cases holding that a public body may not discharge anyone—even an employee without a contractual or property right in his job—and make public reasons for the discharge involving stigma or obloquy, without giving the employee a right to clear his or her name at some kind of a due-process hearing." *Bell v. Sellevold*, 713 F.2d 1396, 1401 (8th Cir.1983), *cert. denied*, 464 U.S. 1070, 104 S.Ct. 978, 79 L.Ed.2d 215 (1984). However, such a "liberty theory" fails if the "defendant never made public any stigmatizing reasons for [its] action." *See id.; accord Johnson*, 113 F.3d at 844 (no public accusations concerning the plaintiff's competence were made by the defendants). In *Bell*, which actually applied these principles to the due process claims of a physician arising from the actions of county commissioners to remove him from space he had been using in a medical clinic owned by the county, *id.* at 1398, the court found that no reasons for termination of the physician's lease on the clinic space had been given to the public; rather, "accusations that Dr. Bell was responsible for 'turmoil' came in a letter written to him at his own lawyer's request," which letter became public only because the plaintiff introduced it as an exhibit at the hearing on his motion for a preliminary injunction. *Id.* at 1401. The Eighth Circuit Court of Appeals found that *"Bishop v. Wood*, 426 U.S. 341, 347–50, 96 S.Ct. 2074, 2078–80, 48 L.Ed.2d 684 (1976), holds that there is no deprivation of constitutionally protected liberty in such a situation." *Id.*

■ Similarly, here, none of the official notices of termination of Randall's contract or AHP status with the Hospital indicates that the termination was other than "without cause." *See* Appendix To Defendants' Motion For Summary Judgment, Deposition Exhibit No. 10 (notice of termination of Anesthesia Services Agreement, dated April 30, 1996); Appendix To Defendants' Motion For Summary Judgment, Deposition Exhibit No. 11 (reiterated notice of termination of contract with Hospital and notice of termination of AHP privileges, dated May 30, 1996). Furthermore, there are no indications that any of these termination notices was ever disseminated to the public in any way. Indeed, Randall asserts the following in his brief in resistance to the defendants' motion for summary judgment:

> What is interesting and important to this case is that the only information ever given to Dan Randall concerning the termination is that it was a "business decision." Ex. 11. This was given to him after a meeting which took place the day before, where his AHP privileges were removed. The first time that any whisper has been made that the decision was based on his professional competence is in this forum, and when affidavits were prepared for the Defendants [sic] Motion for Summary Judgment. Clearly, no notice was ever given of the now asserted reason (or any other reason) and thus there was never an opportunity for Randall to address the allegations. The Defendant does not assert that they [sic] gave notice to the Plaintiff at the time of the meeting, and the Plaintiff asserts that they gave no notice. In fact, they simple [sic] told him of the termination.

Plaintiff's Brief In Support Of Resistance To Motion For Summary Judgment (Plaintiff's Brief), pp. 4–5. Thus, as in *Bell*, Randall concedes that the issue of professional competence was first raised as an issue in response to Randall's lawsuit; professional competence was not asserted as the reason for Randall's dismissal at the

time he was dismissed and no publication of any accusation concerning his professional competence was ever made by the defendants except "in this forum." *Id.* at 4; *and compare Bell,* 713 F.2d at 1401 ("accusations that Dr. Bell was responsible for 'turmoil' came in a letter written to him at his own lawyer's request," which letter became public only because the plaintiff introduced it as an exhibit at the hearing on his motion for a preliminary injunction).

The court concludes that this record is insufficient to generate a genuine issue of material fact that Randall has a liberty interest that was implicated by his dismissal, such that a due process right could attach. *See Johnson,* 113 F.3d at 843 ("An employee's liberty interests are implicated when, in connection with the employee's discharge, a government official makes accusations that seriously damage the employee's standing in the community or foreclose other employment opportunities."); *Bell,* 713 F.2d at 1401 (no liberty interest is implicated when accusations impugning the plaintiff's reputation are not published at the time of dismissal but only in response to plaintiff's post-termination actions). Absent such a liberty interest, his due process claim must fail. *See generally Spitzmiller,* 183 F.3d at 915 (" 'To set forth a procedural due process violation, a plaintiff, first, must establish that his protected liberty or property interest is at stake.' ") (quoting *Gordon,* 168 F.3d at 1114); *accord Roth,* 408 U.S. at 569, 92 S.Ct. 2701; *Graning,* 172 F.3d at 616; *Johnson,* 113 F.3d at 843. The Hospital is therefore entitled to summary judgment on that part of Randall's due process claim founded on a protected liberty interest, and consequently, on the entirety of Randall's first cause of action.

### C. The Sherman Act Claim

#### 1. The Parties' arguments

Randall's second cause of action alleges that "[a]ll defendants" conspired to create an agreement or contract in restraint of trade that would preclude Randall from practicing as a CRNA at the Buena Vista County Hospital in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. The defendants argue that they are entitled to summary judgment on this claim on various grounds. They note that, in the only case in which the Supreme Court has considered an exclusive contract between a hospital and a provider of medical services, *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), the Court likened the exclusive contract to a "tying" arrangement, in which a patient who purchased hospital services was required also to purchase the services of a specific anesthesia group. The defendants argue that the Court did not find such a tying arrangement *per se* illegal, because the hospital did not exercise the degree or kind of market power that enabled it to force customers to purchase a second product. They argue that, in this case, if a patient preferred a different CRNA, that patient could go to one of eight nearby county hospitals. They argue that the Court in *Jefferson Parish Hospital* also rejected a violation based on the "rule of reason," because in that case, as here, there was no "separate market" for anesthesia services. The defendants contend that courts have consistently upheld the types of contractual arrangements between hospitals and "hospital based" medical professionals at issue here, and that there is no evidence here of the Hospital conspiring with another group of providers to force Randall out of the Hospital by means of an exclusive contract with the other providers.

Randall, however, argues that there is evidence of a conspiracy between the Hospital and the Clinic Foundation, in the persons of their administrators, Nelson and Pritchard, to prevent him from practicing at the Hospital. Randall argues that only by terminating his contract with the Clinic Foundation, as well as his contract with the Hospital, could he be precluded from practicing at the Hospital; otherwise, he would have been able to practice at the Hospital, notwithstanding the termination of his independent contract, as a Clinic Foundation employee un-

der the Clinic Foundation's exclusive provider contract with the Hospital. Randall also points out that, unlike the situation in the *Jefferson Parish Hospital* case, the Hospital is the exclusive provider of hospital services in the Storm Lake area, so that patients have no practical choice but to accept the services of anesthetists "tied" to the services of the hospital. Randall relies on the holding in *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440 (9th Cir. 1988), in which the Ninth Circuit Court of Appeals recognized an antitrust claim could be based on exclusive provider contracts where the hospital was the "only game in town." He therefore asserts that genuine issues of material fact should preclude summary judgment on this claim.

### 2. Prohibitions of the Sherman Act

"Section 1 of the Sherman Antitrust act makes it unlawful to form a conspiracy in restraint of trade." *St. Louis Convention & Visitors Comm'n v. N.F.L.*, 154 F.3d 851, 861 (8th Cir.1998); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 558 (8th Cir.1998) (section 1 of the Sherman Antitrust Act "declares it unlawful to contract or form a conspiracy 'in restraint of trade or commerce among the several States' "). Thus, "[t]o demonstrate a violation of section 1 of the Sherman Act, a plaintiff must provide proof of an illegal contract, combination, or conspiracy which results in an unreasonable restraint of trade." *Double D Spotting Serv., Inc.*, 136 F.3d at 558.

A conspiracy in restraint of trade may be either *per se* illegal or subject to a rule of reason:

> Restraints which have [a] "pernicious effect on competition and lack of any redeeming virtue" are illegal per se under Section 1 without inquiry into the reasonableness of the restraint or the harm caused. *Northern Pac. Rwy v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *see also Copperweld Corp. [v. Independence Tube Corp.]*, 467 U.S. [752,] 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 [ (1984) ]; *United States v. Topco Associates, Inc.*, 405

U.S. 596, 607–08, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). Analysis of whether a restriction's harm to competition outweighs any procompetitive effects is necessary if the anticompetitive impact of a restraint is less clear or the restraint is necessary for a product to exist at all. *See Board of Trade of City of Chicago [v. United States]*, 246 U.S. [231,] 238, 38 S.Ct. 242, 62 L.Ed. 683 [ (1918) ]; *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 9–10, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).

*St. Louis Convention & Visitors Comm'n*, 154 F.3d at 861; *accord Double D Spotting Serv., Inc.*, 136 F.3d at 558 (noting that conspiracies in restraint of trade may be *per se* illegal, but " '[m]ost antitrust claims are analyzed under a "rule of reason," according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition' ") (quoting *State Oil Co. v. Khan*, 522 U.S. 3, ——, 118 S.Ct. 275, 279, 139 L.Ed.2d 199 (1997)). To put it another way, while "[c]ertain types of restraint are so inherently anticompetitive that they are illegal per se, without inquiry into the reasonableness of the restraint or the harm caused," the " 'rule of reason' analysis involves an inquiry into the market structure and the defendant's market power in order to assess the actual effect of the restraint." *Double D Spotting Serv., Inc.*, 136 F.3d at 558. " 'It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act.' " *Id.* (quoting *United States v. Topco Assocs.*, 405 U.S. 596, 607–08, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972)). Therefore, " '[p]er se treatment is appropriate once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.' " *Id.* (quoting *Khan*, 522 U.S. at ——, 118 S.Ct. at 279).

### 3. Elements of the claim

■ The elements of a claim of conspiracy in restraint of trade are the following:

(1) there was an agreement among the defendants in restraint of trade; (2) the plaintiff was injured as a direct and proximate result; and (3) the plaintiff's damages are capable of ascertainment and not speculative. *St. Louis Convention & Visitors Comm'n,* 154 F.3d at 861; *see also Read v. Medical X–Ray Ctr., P.C.,* 110 F.3d 543, 545 (8th Cir.1997) (stating one element of the claim to be that the defendant's "allegedly anticompetitive conduct was 'a material cause' of [the plaintiff's] injury") (citations omitted), *cert. denied,* 522 U.S. 914, 118 S.Ct. 299, 139 L.Ed.2d 230 (1997). "The first element is established by proof that there was an agreement in restraint of trade and that the challenged action was 'part of or pursuant to that agreement.'" *Id.* (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 767, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)). Furthermore, "[i]n order to prove that Section 1 defendants were acting pursuant to a conspiracy, a plaintiff must present evidence that tends to exclude the possibility that the alleged coconspirators acted independently, because conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* (internal citations and quotation marks omitted). As to element two, "[i]n order to satisfy the causation element of a Section 1 case, [the plaintiff must] show that the [defendants'] anticompetitive acts were an actual, material cause of the alleged harm to competition." *Id.* at 862; *Read,* 110 F.3d at 545 (requiring that the plaintiff show the defendant's anticompetitive conduct was "a material cause" of his injury). "A material cause is a 'substantially contributing factor.'" *Read,* 110 F.3d at 545 (quoting *National Ass'n of Review Appraisers & Mortgage Underwriters, Inc. v. The Appraisal Found.,* 64 F.3d 1130, 1135 (8th Cir.1995), *cert. denied,* 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996)). Furthermore, "[a]ntitrust injury is 'injury of the type the antitrust laws were intended to prevent and flows from that which makes defendants' acts unlawful.'" *Id.* at 864 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)).

The defendants' challenge to the adequacy of Randall's antitrust claim focuses only on the first of these elements, proof of an agreement in restraint of trade. *See St. Louis Convention & Visitors Comm'n,* 154 F.3d at 861. Although the defendants acknowledge that there was an "agreement," the exclusive provider contract for anesthesia services between the Hospital and the Clinic Foundation, they argue, in essence, that the agreement was not one "in restraint of trade."

#### 4. *Exclusive contracts and "tying"*

The defendants contend that, as the Supreme Court concluded in *Jefferson Parish Hospital,* an exclusive provider contract between a hospital and certain providers of anesthesia services is not an illegal "tying" arrangement. In *Jefferson Parish Hospital,* the Supreme Court framed the issue before it as follows:

> At issue in this case is the validity of an exclusive contract between a hospital and a firm of anesthesiologists. We must decide whether the contract gives rise to a per se violation of § 1 of the Sherman Act because every patient undergoing surgery at the hospital must use the services of one firm of anesthesiologists, and, if not, whether the contract is nevertheless illegal because it unreasonably restrains competition among anesthesiologists.

*Jefferson Parish Hospital,* 466 U.S. at 4–5, 104 S.Ct. 1551. The Court likened the exclusive provider contract to a "tying" arrangement, noting,

> [T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits in the

market for the tied item is restrained and the Sherman Act is violated. *Id.* at 12, 104 S.Ct. 1551. In other words, the Court in *Jefferson Parish Hospital* considered whether exploitation of the defendants' control over hospital services, the tying product, forced the buyer into the purchase of a tied product, anesthesiological services from a particular group of anesthesiologists, that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. The Court reiterated that it had "condemned tying arrangements [only] when the seller has some special ability—usually called 'market power'—to force a purchaser to do something that he would not do in a competitive market." *Id.* at 13–14, 104 S.Ct. 1551.

The Court then considered when a tying arrangement constitutes a *per se* violation of the Sherman Act:

> *Per se* condemnation—condemnation without inquiry into actual market conditions—is only appropriate if the existence of forcing is probable. Thus, application of the *per se* rule focuses on the probability of anticompetitive consequences.... [W]e have refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby....
>
> Once this threshold is surmounted, *per se* prohibition is appropriate if anticompetitive forcing is likely.... The ... strict rule is appropriate in ... situations in which the existence of market power is probable.

*Id.* at 16–18, 104 S.Ct. 1551 (footnotes and citations omitted).

In the case before it in *Jefferson Parish Hospital,* the Court found that the hospital "ha[d] provided its patients with a package that include[d] the range of facilities and services required for a variety of surgical operations," and that the package included "the services of the anesthesiologist." *Id.* at 18, 104 S.Ct. 1551. The hospital argued that it was simply providing "an integrated package of services," not a tying arrangement. *Id.* at 18–19, 104 S.Ct. 1551. The

Court found that "a tying arrangement cannot exist unless two separate product markets have been linked." *Id.* at 21, 104 S.Ct. 1551. Consequently, the Court concluded that "in this case no tying arrangement can exist unless there is a sufficient demand for the purchase of anesthesiological services separate from hospital services to identify a distinct product market in which it is efficient to offer anesthesiological services separately from hospital services." *Id.* at 21–22, 104 S.Ct. 1551.

Examining the record before it in *Jefferson Parish Hospital* in light of these requirements, the Court concluded that "[t]he record amply supports the conclusion that consumers differentiate between anesthesiological services and the other hospital services provided by [the hospital]." *Id.* at 23, 104 S.Ct. 1551. Therefore, "the hospital's requirement that its patients obtain necessary anesthesiological services from [one provider] combined the purchase of two distinguishable services in a single transaction." *Id.* at 24, 104 S.Ct. 1551. However, this fact did not make the arrangement *per se* illegal, if the hospital had no market power to "force" the purchase of the two separate items together. *Id.* The Court found the hospital's "dominance" over persons residing in the parish was "far from overwhelming" where seventy percent of the patients residing in the parish actually entered other hospitals. *Id.* at 26, 104 S.Ct. 1551. The Court found no evidence that patients were "forced" to obtain anesthesiological services they would not otherwise have purchased, because presumably every patient undergoing surgery required such services. *Id.* at 28, 104 S.Ct. 1551. On the record before it, the Court found no basis for applying the *per se* rule against tying to the arrangement in question. *Id.* at 29, 104 S.Ct. 1551.

The Court also found that the evidence did not support a finding that the arrangement violated the Sherman Act under a "rule of reason" analysis, which "involves an inquiry into the actual effect of the

exclusive contract on competition among anesthesiologists." *Id.* The Court's "rule of reason" analysis consisted of the following:

This competition takes place in a market that has not been defined. The market is not necessarily the same as the market in which hospitals compete in offering services to patients; it may encompass competition among anesthesiologists for exclusive contracts such as the Roux contract and might be statewide or merely local. There is, however, insufficient evidence in this record to provide a basis for finding that the Roux contract, as it actually operates in the market, has unreasonably restrained competition. The record sheds little light on how this arrangement affected consumer demand for separate arrangements with a specific anesthesiologist. The evidence indicates that some surgeons and patients preferred respondent's services to those of Roux, but there is no evidence that any patient who was sophisticated enough to know the difference between two anesthesiologists was not also able to go to a hospital that would provide him with the anesthesiologist of his choice.

In sum, all that the record establishes is that the choice of anesthesiologists at East Jefferson has been limited to one of the four doctors who are associated with Roux and therefore have staff privileges. Even if Roux did not have an exclusive contract, the range of alternatives open to the patient would be severely limited by the nature of the transaction and the hospital's unquestioned right to exercise some control over the identity and the number of doctors to whom it accords staff privileges. If respondent is admitted to the staff of East Jefferson, the range of choice will be enlarged from four to five doctors, but the most significant restraints on the patient's freedom to select a specific anesthesiologist will nevertheless remain. Without a showing of actual adverse effect on competition, respondent cannot make out a case under

the antitrust laws, and no such showing has been made.

*Jefferson Parish Hosp.*, 466 U.S. at 29–31, 104 S.Ct. 1551 (footnotes omitted); *accord Double D Spotting Serv., Inc.*, 136 F.3d at 558 (the " 'rule of reason' analysis involves an inquiry into the market structure and the defendant's market power in order to assess the actual effect of the restraint").

A number of courts have more recently considered whether exclusive provider contracts between hospitals and medical professionals pose antitrust violations. The Seventh Circuit Court of Appeals summarized the conclusions of many of these courts:

This case involves one hospital's decisions about staff privileges and staffing patterns. The cases involving staffing at a single hospital are legion. Hundreds, perhaps thousands of pages in West publications are devoted to the issues those circumstances present. Those cases invariably analyze those circumstances under the rule of reason—there is nothing obviously anticompetitive about a hospital choosing one staffing pattern over another or in restricting the staffing to some rather than many, or all. *Bhan v. NME Hospitals,* 929 F.2d 1404, 1412 (9th Cir.1991). A hospital has an unquestioned right to exercise some control over the identity and number to whom it accords staff privileges. *Jefferson Parish Hospital,* 466 U.S. at 30, 104 S.Ct. at 1567–68. Malpractice concerns, quality of care, market perceptions, cost, and administrative considerations may all impact those decisions.

Those hundreds or thousands of pages almost always come to the same conclusion: the staffing decision at a single hospital was not a violation of section 1 of the Sherman Act.

*BCB Anesthesia Care v. Passavant Mem. Area Hosp. Ass'n,* 36 F.3d 664, 667 (7th Cir.1994) (citing cases).

Randall nonetheless asserts that his case is distinguishable from *Jefferson Parish*

*Hospital* and other such cases, because in this case the exclusive contract was not already in existence, but was instead introduced and "orchestrated" for the purpose of excluding him from practice at the Hospital and to ensure that CRNAs for whom the defendants were billing (and from whom they were earning a fee) would not have to compete with an independent anesthetist. He also argues that, unlike the hospital in *Jefferson Parish Hospital*, which was one of twenty hospitals in the New Orleans area, the Hospital here is the only hospital in the market area, which Randall asserts is the Storm Lake area. He likens his case to that before the Ninth Circuit Court of Appeals in *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440 (9th Cir.1988), in which the defendant hospital enjoyed an eighty-four percent share of the patient market in Helena, Montana.

■ Here, the court finds, first, that there is no dispute that "tied" products were created by the Hospital's exclusive contract for anesthesia services with the Clinic Foundation, because, under that agreement, the Clinic Foundation had the exclusive right to provide anesthesia services at the Hospital. What remains to be seen, *inter alia*, is whether there are genuine issues of material fact concerning exploitation of the Hospital's control over its services to force patients to purchase the "tied" anesthesia services. *Cf. Jefferson Parish Hosp.*, 466 U.S. at 12, 104 S.Ct. 1551. On that question, the court finds the barest suggestion from the record that consumers actually differentiated between the anesthesia services provided by the Clinic Foundation and other providers, and thus, by the barest of margins, there is a genuine issue of material fact as to whether the exclusive provider contract "ties" two distinguishable services in a single transaction, as required by *Jefferson Parish Hospital*. *See id.* at 23–24, 104 S.Ct. 1551. Although the Hospital contends that there was no separate market for anesthesia services outside of the Hospital, the record suggests that both doctors and patients might from time to time request the services of a specific anesthetist, indicat-

ing, as in *Jefferson Parish Hospital*, that such consumers differentiated between Hospital and anesthesia services. *Cf. id.* at 23, 104 S.Ct. 1551.

As in *Jefferson Parish Hospital*, this court finds that the circumstances here are not sufficient to establish that the exclusive provider contract is so clearly anticompetitive as to be *per se* illegal. *See id.* at 16–18, 104 S.Ct. 1551. There is no evidence that patients of the Hospital were "forced" to obtain anesthesia services they would not otherwise have purchased, because presumably every patient undergoing surgery at the Hospital required such services. *Id.* at 28, 104 S.Ct. 1551. Furthermore, because a hospital has an "unquestioned right" to exercise some control over the identity and number of staff with practice privileges, a "rule of reason" analysis is appropriate. *See id.* at 29–30, 104 S.Ct. 1551; *BCB Anesthesia Care*, 36 F.3d at 667 ("Those cases [involving staffing at a single hospital] invariably analyze those circumstances under the rule of reason"); *accord Double D Spotting Serv., Inc.*, 136 F.3d at 558 (noting that conspiracies in restraint of trade may be *per se* illegal, but " '[m]ost antitrust claims are analyzed under a "rule of reason," according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition' ") (quoting *Khan*, 522 U.S. at ——, 118 S.Ct. at 279).

■ There is a significant difference in the record between this case and *Jefferson Parish Hospital* concerning the "market power" of the Hospital—*i.e.*, there are genuine issues of material fact on the present record lacking in *Jefferson Parish Hospital*. Although Randall has not articulated what share of the consumer market the Hospital holds, *compare Jefferson Parish Hospital*, 466 U.S. at 24, 104 S.Ct. 1551 (evidence that seventy percent of parish residents actually entered other hospitals was "far from overwhelming" evidence of market power), Randall has pointed out that the Hospital is the only such entity in the relevant geographic market for con-

sumers, which he contends is the Storm Lake, Iowa, area. *Compare id.* at 29, 104 S.Ct. 1551 (finding insufficient evidence in the record for determining geographic market). The Hospital has argued that it is not "the only game in town," because there are eight surrounding counties with hospitals approximately fifty miles or less from Storm Lake. *See* Affidavit of James O. Nelson, p. 1. However, this evidence serves only to establish the opposite pole of the dispute of fact, because neither party has pointed to undisputed evidence demonstrating what percentage of consumers in Storm Lake, or some other appropriately defined market area, actually enter the Buena Vista County Hospital or other hospitals, or even what percentage of doctors with practice privileges at the Hospital also enjoy such privileges at other nearby county hospitals, which would suggest a larger market area beyond Storm Lake itself. *See Jefferson Parish Hospital,* 466 U.S. at 26, 104 S.Ct. 1551 (no evidence of share of consumers actually using the defendant hospital's services); *and compare Oltz,* 861 F.2d at 1446–47 (the defendant hospital "enjoyed the overwhelming majority of the market for general surgery").

These genuine issues of material fact preclude summary judgment in the defendants' favor on Randall's conspiracy claim pursuant to section 1 of the Sherman Act, 15 U.S.C. § 1, founded on a "tying" arrangement resulting from the exclusive anesthesia services provider contract between the Hospital and the Clinic Foundation. *See* FED.R.CIV.P. 56(c) (summary judgment is only appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law").

### 5. *"Group boycott"*

Although the defendants challenged the adequacy of Randall's conspiracy claim only on the basis that the exclusive provider contract is the agreement that is allegedly in restraint of trade, it is apparent from Randall's complaint and his resis-

tance to the motion for summary judgment that he asserts, either instead or in the alternative, that the "agreement" in question is an agreement between the Hospital and the Clinic Foundation, in the persons of their administrators, defendants Nelson and Pritchard, to preclude Randall from practicing at the Hospital. Randall specifically argues that only by terminating his contract with the Clinic Foundation, as well as his contract and AHP privileges with the Hospital, could he be precluded from practicing at the Hospital; otherwise, he would have been able to practice at the Hospital, notwithstanding the termination of his independent contract, as a Clinic Foundation employee under the Clinic Foundation's exclusive provider contract with the Hospital. Thus, although he never used the appropriate "catch phrase," it is apparent that in addition to an anticompetitive "tying" arrangement, Randall is asserting that he was subjected to a "group boycott" by the defendants.

The Eighth Circuit Court of Appeals has explained the fundamental aspects of a "group boycott" as follows:

> The term boycott has a long tradition of usage. As stated in an early case: "Courts differ as to what constitutes a boycott that may be enjoined. All hold that there must be a conspiracy causing irreparable damage to the business or property of the complainant." *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 437, 31 S.Ct. 492, 496, 55 L.Ed. 797 (1911). The First Circuit has said: "The classic anticompetitive 'group boycott' is a concerted action by competitors at one level to protect themselves from competition by non-group members who seek to compete at that level." *Allied Int'l, Inc. v. International Longshoremen's Ass'n,* 640 F.2d 1368, 1380 (1st Cir.1981), *aff'd,* 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982) (citation omitted). The Third Circuit has provided another description: " '[C]lassic' boycotts [include those] in which a group of business competitors seek[s] to benefit

economically by excluding other competitors from the market place. 'The crucial element' in such boycotts, according to Professor Sullivan, 'is an effort to exclude or cause disadvantage to one or more competitors by cutting them off from trade relationships which are necessary to any firm trying to compete.' " *Larry V. Muko, Inc. v. Southwestern Pa. Bldg. & Constr. Trades Council,* 670 F.2d 421, 429–30 (3d Cir.), *cert. denied,* 459 U.S. 916, 103 S.Ct. 229, 74 L.Ed.2d 182 (1982).

The Supreme Court has held that the means used to restrain competition were irrelevant. *See Gompers,* 221 U.S. at 438, 31 S.Ct. at 496. *See also American Tobacco Co. v. United States,* 328 U.S. 781, 809, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575 (1946). What is important is that an anticompetitive motive propel the actions. " 'In each of [the] cases [finding an illegal boycott] the aim and purpose of the group boycott or refusal to deal was either to compel the object of the boycott to adopt a certain standard of trade practice, or to exclude him from competition.' " *M & H Tire Co. v. Hoosier Racing Tire Corp.,* 733 F.2d 973, 979 (1st Cir.1984) (citation omitted). *See also American Tobacco,* 328 U.S. at 809, 66 S.Ct. at 1138 ("It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns.").

*In re Workers' Compensation Ins. Antitrust Litig.,* 867 F.2d 1552, 1561 n. 14 (8th Cir.1989), *cert. denied,* 492 U.S. 920, 109 S.Ct. 3247, 106 L.Ed.2d 593, *and cert. denied,* 493 U.S. 818, 110 S.Ct. 72, 107 L.Ed.2d 39 (1989). "A group boycott results in impermissible harm even if it results in lower prices or temporarily stimulates competition because such boycotts have, by their 'nature and character, a monopolistic tendency' to restrain free trade." *National Ass'n of Review Appraisers and Mortgage Underwriters, Inc.,* 64 F.3d at 1134 (quoting *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 213, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959)).

The "group boycott" Randall alleges here is a boycott by the Hospital and the Clinic Foundation, acting through their respective administrators, to keep him from practicing in the Storm Lake area. The Hospital and Clinic Foundation are not *necessarily* competitors joining to keep out another competitor, Randall, the "classic" boycott scenario. *See In re Workers' Compensation Ins. Antitrust Litig.,* 867 F.2d at 1561 n. 14 (" '[C]lassic' boycotts [include those] in which a group of business competitors seek[s] to benefit economically by excluding other competitors from the market place.") (quoting *Larry V. Muko, Inc. v. Southwestern Pennsylvania Bldg. & Constr. Trades,* 670 F.2d 421, 429–30). They are, however, potential competitors, as the Hospital could supply its own need for CRNAs by hiring in-house staff, instead of contracting with the Clinic Foundation for CRNA services. More importantly, "It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns." *American Tobacco,* 328 U.S. at 809, 66 S.Ct. 1125; *accord In re Workers' Compensation Ins. Antitrust Litig.,* 867 F.2d at 1561 n. 14 (quoting *American Tobacco*). In one "group boycott" case considered by the Eighth Circuit Court of Appeals involving staff privileges at a hospital, all of the members of the alleged boycott were members of the staff of one hospital and that hospital itself, which is comparable to the scenario here, which is a boycott allegedly involving the Hospital and the entity providing is anesthesia staff. *Flegel v. Christian Hosp., Northeast–Northwest,* 4 F.3d 682, 684 (8th Cir.1993). The result of the alleged boycott here is certainly the "classic" exclusion of the boycotted party from competing in the relevant market, here allegedly the Hospital or Storm Lake area anesthesia services market. *In re Workers' Compensation Ins. Antitrust Litig.,* 867 F.2d at 1561 n. 14 (" '[C]lassic' boycotts [include those] in which a group of business competitors seek[s] to benefit economically by excluding other competitors from the market

place.") (quoting *Larry V. Muko, Inc.*, 670 F.2d at 429–30); *accord American Tobacco*, 328 U.S. at 809, 66 S.Ct. 1125 (the result allegedly achieved is the identifying feature of an illegal boycott).

■■ "Group boycotts" are generally *per se* illegal. *See id.* However, in *Flegel v. Christian Hosp., Northeast–Northwest*, 4 F.3d 682 (8th Cir.1993), the Eighth Circuit Court of Appeals held that a group boycott similar to the one asserted here is subject to the rule of reason. *See Flegel*, 4 F.3d at 685–87; *accord Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 275 n. 3 (3d Cir.1999) (rejecting *per se* analysis of a group boycott against a doctor by a hospital and groups of surgeons); *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 748–49 (11th Cir.1998) (also rejecting *per se* analysis of a similar group boycott claim), *cert. denied sub nom. Quality Prof'l Nursing, Inc. v. Bethesda Mem. Hosp., Inc.*, —— U.S. ——, 119 S.Ct. 1250, 143 L.Ed.2d 347 (1999). In *Flegel*, the plaintiff doctors of osteopathy asserted that the defendant hospital and its staff conspired in a group boycott to exclude them from practice privileges at the hospital. *Id.* at 684–85. The Eighth Circuit Court of Appeals noted that "the courts of appeals have generally examined the denial or revocation of hospital privileges under the rule of reason." *Id.* at 686 (citing cases). The court also relied on the decision of the Ninth Circuit Court of Appeals in *Bhan v. NME Hosp., Inc.*, 929 F.2d 1404 (9th Cir.), *cert. denied*, 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991), for the proposition that " 'only certain boycotts are unlawful per se,' " although " 'the distinction between those that are and those that must be tested under the rule of reason is less than crystal clear.' " *Flegel*, 4 F.3d at 687 (quoting *Bhan*, 929 F.2d at 1412). The court relied on "rule of reason" treatment of the matter as the boycott was purportedly an example of "industry self-regulation." *Id.* (citing *Weiss v. York Hosp.*, 745 F.2d 786 (3d Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985)).

Turning to the legality of the boycott in *Flegel* under the rule of reason, the Eighth Circuit Court of Appeals looked for evidence of "detrimental effects to competition, often [determined] by defining the relevant market and considering the evidence of the defendant's power within that market." *Id.* at 688. However, the court observed that the market definition and market power analysis was not necessarily required where there was evidence of " 'actual detrimental effects.' " *Id.* (quoting *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986)). If either market power or actual detrimental effects are shown, the court noted that the burden shifts to the defendant to "demonstrate pro-competitive effects." *Id.* If that demonstration is made, the plaintiff must " 'then try to show that any legitimate objectives can be achieved in a substantially less restrictive manner.' " *Id.* (quoting *Bhan*, 929 F.2d at 1413).

■■ Randall has not, at this point, asserted actual anticompetitive effects, apart from his own exclusion from practice in the Storm Lake area, and the defendants' principal challenge to Randall's antitrust claims has been the lack of market power of the Hospital owing to the availability of other county hospitals within a reasonable distance. Therefore, the court returns to the question of market power of the defendants, which the court considered above in reference to Randall's "tying" claim. Although evidence of market power was lacking in *Flegel, see Flegel*, 4 F.3d at 689–91, as it had been in the "tying" case of *Jefferson Parish Hospital, see Jefferson Parish Hosp.*, 466 U.S. at 26, 104 S.Ct. 1551, there is a genuine issue of material fact as to the Hospital's market power here, arising from Randall's assertion that the Hospital is the "only game in town."

These genuine issues of material fact preclude summary judgment in the defendants' favor on Randall's conspiracy claim pursuant to section 1 of the Sherman Act, 15 U.S.C. § 1, founded on a "group boy-

cott" of Randall by the Hospital and the Clinic Foundation. *See* FED.R.CIV.P. 56(c) (summary judgment is only appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law"). Therefore, the defendants are not entitled to summary judgment on Randall's antitrust claim.

### D. Wrongful Discharge

#### 1. The parties' arguments

Finally, the court turns to the defendants' arguments for summary judgment on Randall's "wrongful discharge" claim. Under Iowa law,

> Employment relationships in Iowa are presumed to be at-will. *Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 281 (Iowa 1995). In the absence of a valid employment contract, an employer may discharge an employee at any time, for any reason, or no reason at all. *Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 219 (Iowa 1996); *Anderson*, 540 N.W.2d at 281. We have recognized only two narrow exceptions to this general rule: (1) where the discharge clearly violates a "well-recognized and defined public policy of the state"; and (2) where a unilateral contract is created by an employer's handbook or policy manual. *Huegerich*, 547 N.W.2d at 220 (quoting *Springer v. Weeks & Leo Co.*, 429 N.W.2d 558, 560 (Iowa 1988)).

*Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 202–03 (Iowa 1997); *accord Below v. Skarr*, 569 N.W.2d 510, 511 (Iowa 1997) (quoting *Phipps*). In his wrongful discharge claim, Randall asserts both violation of public policy and violation of an employer's handbook or policy manual. He alleges that the "defendants" wrongfully discharged him contrary to the stated public policy of IOWA CODE § 20.7(3) and/or the rights guaranteed him by the personnel policies of the Hospital and Clinic Foundation.

The Hospital contends that its employee manual has no application to AHPs who, like Randall, were independent contrac-

tors. The Clinic Foundation contends that its "Benefits and Policies Handbook" has nothing to do with the termination of CRNAs, because the provisions regarding termination of CRNAs are set forth in the employment contract between the Clinic Foundation and the individual CRNA. The Clinic Foundation argues further that, if its policies handbook applies, it provides no support for Randall's claim, because it only requires less notice than Randall actually got of his termination without cause.

Randall claims that the problem-solving procedure called for in the Clinic Foundation's Handbook was never used, and thus his termination by the Clinic Foundation was wrongful. However, he also contends that the "real issue" is that his contract with the Clinic Foundation was breached in violation of the Sherman Act, and that the Hospital had no reason for termination of his Anesthesia Services Agreement except that Nelson and Pritchard were conspiring to end his CRNA career at the Hospital. Randall does not reiterate any "public policy" argument.

#### 2. Contract employee

■ Both the Hospital and the Clinic Foundation argue, in the first instance, that Randall's contracts are controlling on the question of whether his termination was "wrongful." As noted above, the public policy and handbook exceptions to Iowa's at-will employment policy apply "[i]n the absence of a valid employment contract." *Phipps*, 558 N.W.2d at 202–03; *accord Below*, 569 N.W.2d at 511 (quoting *Phipps*); *Huegerich*, 547 N.W.2d at 219. Randall had a contract with each institution; thus, his wrongful discharge claim would appear to be governed by the terms of those contracts, not by the "public policy" or "handbook" exceptions to at-will employment.

The court held above, in Section II.B.2.a., beginning on page 953, in reference to Randall's due process claim, that the provisions of Randall's Anesthesia Services Contract with the Hospital governed the

termination of that contract and the termination of Randall's AHP privileges, and that neither termination violated the terms of the contract. Randall also cannot generate a genuine issue of material fact that his termination by the Clinic Foundation was in violation of the terms of his contract with that institution, because he was given sufficient notice of a "without cause" termination pursuant to Section 6 of the contract. *See* Appendix To Defendants' Motion For Summary Judgment, Deposition Exhibit No. 4, Buena Vista Clinic Foundation Professional Employment Agreement (Clinic Employment Agreement), § 6. The provision of the Clinic Employment Agreement provides, in pertinent part, that the agreement would renew automatically "if neither party gives written notice to the other party of intent not to renew at least sixty (60) days prior to the scheduled expiration of the then current term." *Id.* Randall was notified by a written Notice of Nonrenewal of Professional Employment Agreement from Pritchard, dated May 29, 1996, more than sixty days prior to the end of the first term of his contract, that his contract with the Clinic Foundation would not be renewed and would accordingly expire on August 21, 1996.

Thus, Randall cannot assert a wrongful discharge claim based on violation of his contracts with the two institutional defendants and the defendants are entitled to summary judgment on Randall's wrongful discharge claim to the extent it is based on violation of the terms of his employment contracts. The defendants are also entitled to summary judgment on this claim to the extent it is based on violation of public policy or an employment handbook, because Randall cannot invoke such exceptions to at-will employment in the face of the existence of a valid employment contract.

### 3. Public policy exception

■ In the alternative, assuming that Randall can assert a "public policy" discharge claim, despite controlling contracts, Randall cannot base such a claim on violation of IOWA CODE § 20.7(3), the "public policy" ground he pleaded in his Complaint. The statutory provision in question states that "[p]ublic employers shall have ... the right to ... [s]uspend or discharge public employees for proper cause." IOWA CODE § 20.7(3). In *Lockhart v. Cedar Rapids Community Sch. Dist.*, 577 N.W.2d 845 (Iowa 1998), the Iowa Supreme Court responded to the following question certified to it by this court: "Does Iowa Code § 20.7(3) negate the presumption of at-will employment for all public employees covered under this provision of the Iowa Public Employment Relations Act?" *See Lockhart*, 577 N.W.2d at 845; *see also Lockhart v. Cedar Rapids Community Sch. Dist.*, 963 F.Supp. 805 (N.D.Iowa 1997) (certifying the question). The Iowa Supreme Court answered the certified question "no." *Lockhart*, 577 N.W.2d at 849. More specifically, the Iowa Supreme Court held as follows:

> In examining the context in which the "proper cause" language appears, we conclude the legislature did not intend to establish a just-cause limitation on the right of a public employer to discharge an employee. The legislature's intent in section 20.7(3) was merely to restate the public employer's common law right to terminate an employee at will for any lawful reason, in other words, one not violative of public policy.

*Id.* at 848. Thus, IOWA CODE § 20.7(3) does not itself establish any public policy against at-will termination of a public employee.

■ Nor can Randall properly base a claim of discharge in violation of public policy upon a violation of the Sherman Act, the position he asserts in his resistance to the defendants' motion for summary judgment. Such a claim is fully comprehended within Randall's separate Sherman Act claim, as both claims rely on an *identical* theory of wrongful conduct, not *alternative* theories, and the Sherman Act contains its own enforcement provisions. *See Olson v. Prosoco, Inc.*, 522 N.W.2d 284, 287 (Iowa

1994) (where claims depend upon proof of the same elements, they are duplicative, and only one may be submitted to the jury); *and compare Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 770–71 (Iowa 1999) (alternative theories may be submitted to the jury, but duplicative damages awards compensating for the same loss are not permitted). Therefore, a wrongful discharge claim premised on the same violation of the Sherman Act asserted in a separate Sherman Act conspiracy claim is merely duplicative of the Sherman Act claim.

Consequently, the defendants are entitled to summary judgment on Randall's wrongful discharge claim, to the extent that claim is premised on discharge in violation of public policy.

### 4. Handbook exception

In the alternative, again assuming that Randall can assert a wrongful discharge claim based on violation of an employment handbook where his employment is subject to controlling contracts, Randall cannot base such a claim on the language of any handbook at issue here. Randall has not pointed to any "handbook" of the Hospital; rather, he points to a "handbook" of the Clinic Foundation as the basis for this part of his claim.

■ Under Iowa law, an implied contract of employment can arise from an employee handbook if the following conditions are met: (1) the handbook is sufficiently definite in its terms to create an offer; (2) the handbook is communicated to and accepted by the employee so as to create an acceptance; and (3) the employee provides consideration. *Jones v. Lake Park Care Ctr., Inc.*, 569 N.W.2d 369, 375 (Iowa 1997); *Thompson v. City of Des Moines*, 564 N.W.2d 839, 844 (Iowa 1997).

■ To determine whether the first requirement has been met, that is, to determine whether the language of the handbook creates a contract, the Iowa Supreme Court looks at the following factors:

(1) Is the handbook in general and the progressive disciplinary procedures in particular mere guidelines or statement of policy, or are they directives?

(2) Is the language of the disciplinary procedures detailed and definite or general and vague?

(3) Does the employer have the power to alter the procedures at will or are they invariable?

*Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 286 (Iowa 1995); *accord Jones*, 569 N.W.2d at 375 (quoting *Anderson*). "The key to determining whether a contract has been created is whether a reasonable employee upon reading the handbook would believe they had been guaranteed certain protections by their employer." *Jones*, 569 N.W.2d at 375. An appropriate disclaimer, rather than mere reservation of the right to alter provisions, will more likely ensure that no implied contract is created by the terms of the handbook. *Id.* at 376. Whether a handbook binds the parties in a contract is a question of law for the court. *See Thompson*, 564 N.W.2d at 844; *Yockey v. Iowa*, 540 N.W.2d 418, 422 (Iowa 1995).

■ Randall relies on the following provisions of the Buena Vista Clinic Foundation Benefits & Policies Handbook:

**PROBLEM SOLVING PROCEDURE:** Misunderstandings or conflicts can arise in any organization. To ensure positive and effective working relations, it is important that concerns be resolved before serious problems develop. Although most incidents resolve themselves, in the event a situation persists that you believe is not fair, or has not been explained adequately, you should follow the procedure below:

**Step One: Meet with Unit Leader:** Discuss the problem with your immediate supervisor. If you believe a discussion with your supervisor would not be appropriate, you may go to Step Two.

**Step Two: Meet with Department Supervisor:** Should you and your unit leader be unable to settle the problem or if a discussion with your unit leader is inappropriate, you may arrange a dis-

cussion with your department manager. The manager shall thoroughly review the situation, including your supervisor's efforts to resolve the problem and will respond to you ordinarily within three working days.

**Step Three: Meet with Clinic Manager:** If you are not satisfied with previous measures, you may present your case in writing to the manager. The Manager shall observe proper methods to address your concern. The manager shall respond to you in writing ordinarily within three working days. The manager [sic] decision is final unless an appeal is accepted for review by the Grievance Board of the Clinic Affairs Committee.
\* The proper forms for completing a written report may be obtained from the Clinic Manager.

Plaintiff's Statement of Contested Facts, Exhibit E, Buena Vista Clinic Foundation Benefits & Policies Handbook (Clinic Policies Handbook), p. 3. As a matter of law, these provisions of the Clinic Foundation's handbook do not create a contract of employment terminable only for cause.

First, the provision in question does not establish progressive disciplinary procedures at all. *Anderson*, 540 N.W.2d at 286 (step one of analysis is to consider whether the handbook in general and the progressive disciplinary procedures in particular are mere guidelines or statement of policy, or are directives); *accord Jones*, 569 N.W.2d at 375 (quoting *Anderson* ). Rather, it suggests a procedure for *employees* to pursue when they encounter some "conflict" or "confusion." The court concludes that no reasonable employee, upon reading this provision of the handbook, would believe he or she had been guaranteed such procedures would be followed prior to termination by his or her employer. *Jones*, 569 N.W.2d at 375.

Furthermore, the procedures, such as they are, are not directives, but are cast in terms of guidelines or a preferred approach as a matter of policy. *See Anderson*, 540 N.W.2d at 286. These procedures place the onus upon *the employee* to pursue the procedure the employee deems appropriate to address his or her "concern." They do not require the employer to do anything, except respond to a complaint from an employee. Again, the court concludes that no reasonable employee, upon reading this provision of the handbook, would believe he or she had been guaranteed such procedures would be followed prior to termination by his or her employer. *Jones*, 569 N.W.2d at 375.

Third, even if the procedures established progressive disciplinary procedures, they could not establish a contract for "for cause" employment in the face of a specific disclaimer in the policy manual or handbook. *See Jones*, 569 N.W.2d at 376 (an appropriate disclaimer, rather than mere reservation of the right to alter provisions, will more likely ensure that no implied contract is created by the terms of the handbook). Here, above the employee's acknowledgment of receipt of the handbook, headed by a caption that reads, *"AN IMPORTANT NOTE,"* the Clinic Policies Handbook states that the Clinic Foundation "reserves the right to make any change in policies or benefit plans without notice"; that "[t]his handbook is intended as a guide for your questions. It is not a guarantee of employment, benefits, or eligibility for benefits"; and specifically states that "[n]o contract of employment exists between the employee and the Buena Vista Clinic Foundation for a specific or definite period. The Buena Vista Clinic Foundation may terminate an employee at any time for any reason." Clinic Policies Handbook, unnumbered preface. As a matter of law, *see Thompson*, 564 N.W.2d at 844 (whether a handbook binds the parties in a contract is a question of law for the court); *Yockey*, 540 N.W.2d at 422 (same), Randall's assertions of violation of a right to continued employment based on the provisions of the Handbook cannot stand in the face of this disclaimer. *Jones*, 569 N.W.2d at 376 (an effective disclaimer may prevent creation of employment rights by a handbook).

Therefore, on these grounds, the defendants are entitled to summary judgment on that part of Randall's wrongful discharge claim founded on violation of the provisions of an employment handbook, and consequently on the entirety of Randall's wrongful discharge claim.

### III. CONCLUSION

Defendants' motion for summary judgment must be granted in part and denied in part. Defendants' motion for summary judgment on Randall's "due process" claim is **granted,** because Randall has failed to generate a genuine issue of material fact that he has either a property or liberty interest on which such a claim can be founded. The defendants' motion for summary judgment is also **granted** on Randall's wrongful discharge claim, because his discharge was not in violation of the terms of the pertinent contracts, and he has pointed to no adequate basis in the public policy of this state or the terms of employment handbooks for a requirement that termination must be "for cause."

However, the defendants' motion for summary judgment must be **denied** as to Randall's Sherman Act claim. The court finds that there are genuine issues of material fact as to the "market power" of the Hospital precluding summary judgment on a Sherman Act claim founded on either an illegal "tying" arrangement or "group boycott."

**IT IS SO ORDERED.**