United States Court of Appeals,

Eleventh Circuit.

Nos. 95-4714, 95-5218.

ALL CARE NURSING SERVICE, INC., Benson Health Care Services, Inc., et. al., Plaintiffs-Appellees,

v.

HIGH TECH STAFFING SERVICES, INC., Defendant-Appellant.

ALL CARE NURSING SERVICE, INC., Plaintiff-Appellant,

A Complete Health Service, Inc., Quality Professional Nursing, Inc., et al., Plaintiffs-Appellants,

Julie Monahan, Counter-Defendant-Appellant,

v.

BETHESDA MEMORIAL HOSPITAL, INC., NME Hospitals, Inc., et. al., Defendants-Appellees,

High Tech Staffing Services, Inc., Defendant-Appellant-Cross-Appellee.

Feb. 18, 1998.

Appeals from the United States District Court for the Southern District of Florida. (No. 88-8568-CIV-JCP), James C. Paine, Judge.

Before EDMONDSON and BARKETT, Circuit Judges, and WELLFORD[*], Senior Circuit Judge.

EDMONDSON, Circuit Judge:

Two separate actions (with different plaintiffs) against the same defendants for alleged antitrust violations have been consolidated and are treated as one appeal. Plaintiffs appeal a jury verdict for defendants on antitrust claims. They also appeal the jury verdict against them on counterclaims for state and federal RICO violations. Many issues were raised on appeal. But we

---

[*]Honorable Harry W. Wellford, Senior U.S. Circuit Judge Sixth Circuit, sitting by designation.

conclude that most of the challenges obviously lack merit, and we do not discuss them in this opinion. We do discuss a couple of issues in some detail, and we affirm the district courts' judgments.

*Background*

Beginning in the mid-1980's the United States experienced a severe nursing shortage. Southern Florida was hit especially hard due to its increased demand for nurses in winter months to accommodate the high influx of people to the area at that time of year. This shortage, along with other market considerations, caused an increase in prices for nursing services and a difficulty in staffing hospitals (and other facilities) with sufficiently licensed nurses.[1]

Hospitals use full or part-time hospital nurses, contract nurses (nurses hired for a specified period of time), travel nurses (contract nurses hired from different areas of the country), and temporary nurses (nurses employed by agencies and hired by hospitals for a shift at a time).[2] Temporary nursing agencies send their nurses to hospitals, nursing homes, clinics, doctors' offices, and patients' homes. They have the choice to provide services for any facility or person in need of such care. They are not limited to providing nurses to hospitals.

During the pertinent period, hospitals were faced with quality concerns, as well as rising prices. No efficient means existed to share information with other hospitals about agency nurses. This lack of information resulted in problems with some agencies, including plaintiff-appellant All

---

[1]Nurse qualifications fall into at least three different licensing categories: Registered Nurse (RN), Licensed Practical Nurse (LPN), and Certified Nursing Assistant (CNA).

[2]These temporary nursing agencies are also providers of travel and contract nurses to hospitals.

Care Nursing Services, Inc. ("All Care").[3] These problems included "phantom booking"—where a hospital requests a specific nurse with whom it has dealt in the past, only to be sent a different nurse; "blind booking"—where a hospital sets up to receive the services of a nurse from an agency only to have the agency cancel at the last minute; fraudulent billing—billing hospitals for services of an RN when actually a less qualified LPN or CNA performed the services; cheating on certification exams; and altering certification documents.

In response to the problems the South Florida Hospital Association ("SFHA") approached hospitals in Palm Beach County about a potential purchasing arrangement. In 1988, twelve (12) Palm Beach County hospitals set up an arrangement whereby they would solicit bids from temporary nursing agencies and would then select agencies to be preferred providers of such services, the Preferred Provider Program ("PPP"). The selection of the preferred agencies was to be made based upon competence, services provided, quality, and bid price. Under this joint-buying arrangement all the participating hospitals agreed to seek first nurses from preferred providers before going to nonpreferred agencies for nurses on each occasion.

All agencies were invited, either by letter or by advertisement in the Palm Beach newspaper (*Palm Beach Post*), to participate in the bidding. Sixteen (16) agencies presented bids and eight (8) were selected as preferred.[4]

---

[3]The problems described formed the basis of the counterclaim against All Care and Monahan for federal and state RICO violations.

[4]Some of the appellant agencies participated in the bidding process, others did not. Following the submission of the initial bids four (4) agencies were eliminated based on their bid prices, which in some instances were 50% higher than other agencies' bids. The remaining twelve (12) rebid and were considered using the established criteria. Which agencies actually resubmitted bids is unclear. But, all of the accepted agencies bid prices higher than the price ranges suggested by the SFHA in its invitation to bid. None of the appellants was selected as preferred providers.

In November 1988, the PPP began operation. Each hospital entered into individual contracts with each of the preferred agencies. All the agencies selected as preferred providers were required to agree to things like treating their nurses as employees by providing workers' compensation, paying taxes, and providing necessary insurance. Before the PPP, agencies had treated their nurses as independent contractors, not employees; and the higher costs associated with unprotected workers were borne by the hospitals.[5]

The preferred agencies did not contract with the hospitals at the same prices, but instead at the prices that each particular agency had bid. Agencies were also required to agree in the contracts not to change their prices for one year—the length of each contract—and, thus, were somewhat tied into their bid prices. But to allow for shifts due to market changes, each agency could terminate its contract with a particular hospital upon 30 days notice (the "escape clause").

After the creation of the PPP, plaintiffs-appellants filed suit against the participating hospitals, preferred agencies, and the SFHA[6] alleging antitrust violations under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and under Florida Statutes §§ 542.18 and 542.19. Defendants then filed a counterclaim against All Care, and its operator Monahan, for violations of federal and state RICO statutes by billing fraudulently, aiding cheating on certification exams, and aiding

---

[5]The hospitals felt the need to place some of the financial burden on the agencies because after the bidding, agency services were actually costing more than before the PPP. These contract provisions were a way to shift some of the cost back to the agencies.

[6]Plaintiffs-appellants include: All Care Nursing Services, Inc.; A Complete Health Care Services, Inc.; Benson's Health Care Services, Inc.; Critical Health Care, Inc.; Quality Professional Nursing of Florida, Inc.; and P.D.Q. Nurse, Inc.

Defendants-appellees include the SFHA, twelve (12) Palm Beach County hospitals, and four (4) remaining agency defendants (four (4) agencies settled with plaintiffs before final disposition in the district court).

persons to obtain false certification.[7]

Awaiting trial, plaintiffs-appellants sought and received a preliminary injunction, which halted implementation of the PPP. That preliminary injunction, however, was vacated by this court because of the district court's failure to hold the necessary evidentiary hearing. *All Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc.,* 887 F.2d 1535 (11th Cir.1989). The request for an injunction was never reinstated.

After a four-week jury trial, a verdict was entered in favor of defendants on all relevant claims. Plaintiffs filed motions for new trial, for judgment as a matter of law, and for amendment of the pleadings to conform with the evidence. All these motions were denied by the district court; and we now affirm those denials.[8] Plaintiffs-appellants also appeal the antitrust and RICO counterclaim verdicts against them; but we affirm those judgments, too.

*Discussion*

*I. Federal and State RICO Claims*

Plaintiffs-appellants All Care and Monahan argue that the Florida and Federal RICO claims against them are barred by the economic-loss rule. That rule provides that "parties to a contract can only seek tort damages if conduct occurs that establishes a tort distinguishable from or independent of [the] breach of contract." *Jones v. Childers,* 18 F.3d 899, 904 (11th Cir.1994) (citations and quotations omitted). The rule is based upon the idea that "contract principles are more appropriate than tort principles for resolving economic loss claims." *Florida Power & Light Co. v. Westinghouse Elec. Corp.,* 510 So.2d 899, 901 (Fla.1987).

---

[7]Claims of fraud, civil theft, and false representation against All Care and Monahan were dismissed before trial.

[8]Also affirmed is the district court's decision in the bench trial of Defendant High Tech's Lanham Act counterclaim.

Neither All Care nor Monahan can use the economic-loss rule to escape liability under the federal RICO statutes.[9]  We have already ruled that Florida's economic-loss rule does not bar a plaintiff from "bringing a [federal] RICO action where a breach of contract claim also exists .... many RICO cases involve contract disputes." *Arabian American Oil Co. v. Scarfone,* 939 F.2d 1472, 1478 (11th Cir.1991).

About the state RICO claims, Florida's RICO statutes have consistently been interpreted using federal RICO claims cases.  No reason has been presented to us to justify applying the economic-loss rule differently to RICO claims made under state and federal RICO statutes.[10]  Thus, the economic-loss rule does not bar these claims.

*II. Antitrust Claims*

Plaintiffs-appellants argue that the formation and operation of the Palm Beach County PPP is a violation of the antitrust laws of the Sherman Act and Florida Statutes §§ 542.18 and 542.19,[11]

---

[9]Defendants argue that Monahan cannot be afforded the benefit of the economic-loss rule because she, individually, entered into no contract with the defendant hospitals:  she lacked privity of contract.  All contracts were between her agency, All Care, and the hospitals.  Because we conclude that the economic-loss rule does not bar RICO claims, state or federal, we need not decide this question.  But, the Florida Supreme Court has held, at least under one set of facts, that privity is not required for the economic-loss rule to apply.  *See Casa Clara Condominium Ass'n v. Charley Toppino and Sons, Inc.,* 620 So.2d 1244 (Fla.1993);  *see also Hoseline, Inc. v. U.S.A. Diversified Products, Inc.,* 40 F.3d 1198, 1200 (11th Cir.1994) (where this court applied *Casa Clara* to make "meritless" a claim that the rule does not bar tort claims between parties who lack contractual privity).

[10]Plaintiffs-appellants also challenged the RICO counterclaims on another ground:  that reliance on the alleged misrepresentations made by All Care and Monahan was not proved by defendants.  Reliance is only an element of a RICO claim to the extent that a RICO plaintiff must prove he was injured by reason of the RICO defendant's deception and fraud.  *Pelletier v. Zweifel,* 921 F.2d 1465, 1499 (11th Cir.1991).  But, no argument is made by the plaintiffs-appellants that injury was inadequately shown.  So, lack of reliance does not require reversal on this claim.

[11]Federal and Florida antitrust laws are analyzed under the same rules and case law.  Fla. Stat. § 542.32 ("It is the intent of the Legislature that, in construing this chapter, due consideration

prohibiting restraints on trade. The Sherman Act, in relevant part, sets out these rules:

> Section 1: Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal....

> Section 2: Every person who shall monopolize, or attempt to monopolize, or combine or conspire ... to monopolize ... shall be deemed guilty of a felony.

15 U.S.C. § 1; 15 U.S.C. § 2.

Despite the expansive language of the statute, the Supreme Court has interpreted this statute to prohibit only "unreasonable" restraints on trade. "A restraint may be violative of the Sherman Act because it is solely a naked restraint of trade so offensive to competition as to be unreasonable per se, or because it runs afoul of the more detailed rule of reason inquiry." *Retina Assocs., P.A. v. Southern Baptist Hosp. of Florida, Inc.,* 105 F.3d 1376, 1380 (11th Cir.1997).

Some acts have been said to be so facially anticompetitive that by their very nature they are deemed unreasonable and, thus, per se violative of antitrust laws. These "practices are "so plainly anticompetitive,' and so often "lack ... any redeeming virtue,' that they are conclusively presumed illegal without further examination under the rule of reason...." *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 7-8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979) (internal citations omitted) ("*BMI* "). Price fixing, horizontal market divisions, tying arrangements, and group boycotts have emerged as practices that are generally illegal per se. *See National Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.,* 779 F.2d 592, 598 (11th Cir.1986) (citing *United States v. Parke,*

---

and great weight be given to the interpretations of the federal courts relating to comparable federal antitrust statutes."); *see also St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.,* 457 So.2d 1028, 1032 (Fla.Dist.Ct.App.1984) ("[T]he Florida legislature has, in effect, adopted as the law of Florida the body of antitrust law developed by the federal courts under the Sherman Act."); Fla. Stat. §§ 542.16 (Florida antitrust laws complement federal antitrust laws), 542.18 (analogous to § 1 of the Sherman Act). So, for purposes of this opinion discussion of the law under the Sherman Act is equally applicable to the plaintiffs-appellants' state antitrust claims.

*Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 [1960] ); *State Oil Co. v. Khan,* --- U.S. ----, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); *Fashion Originators' Guild of America v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

"But easy labels do not always supply ready answers." *BMI,* 441 U.S. at 8, 99 S.Ct. at 1556. Since the emergence of these per se categories, we have stressed that "whether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same—whether or not the challenged restraint enhances competition." *National Bancard Corp.,* 779 F.2d at 598 (citation and quotation omitted). The Supreme Court, as well, has refused to force various practices into "pigeonhole[s] and [to invoke] the per se rule." *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 458, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986).

A "rule of reason" is generally applied to determine what acts are permissible. *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 60, 31 S.Ct. 502, 515-16, 55 L.Ed. 619 (1911). Thus, a presumption exists that the circumstances of a case will be looked at in the light of the rule of reason standard and will not be deemed per se unreasonable. *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 723, 726, 108 S.Ct. 1515, 1518-19, 1520-21, 99 L.Ed.2d 808 (1988). But, there are no bright lines. "The decision to apply the per se rule [instead of the rule of reason] turns on "whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output ... or instead one designed to "increase economic efficiency and render markets more, rather than less, competitive.' " *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 289-90, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985).

In *Northwest,* the Supreme Court observed that what activities might fall into a per se

category is "far from certain." *Id.* at 294, 105 S.Ct. at 2619. Considerable inquiry into the market conditions and market power of the defendant is often necessary before conduct can be presumed to be anticompetitive. *Id.* at 296, 105 S.Ct. at 2620-21 (addressing group boycotts).

Plaintiffs-appellants claim that the PPP's arrangement is per se illegal as both price fixing and as a group boycott. Thus, plaintiffs-appellants have the burden to make a threshold showing that the PPP falls into one of these forbidden categories. *See Id.* at 298, 105 S.Ct. at 2621. In this case, plaintiffs-appellants allege that, because price bids were a consideration in determining which temporary nurse agencies would become preferred providers, this conduct falls into the forbidden category of price fixing. They also claim that the exclusion of the nonpreferred agencies from the PPP amounts to a group boycott.

The decision whether the PPP established by defendants-appellees amounts to either a price fix or a group boycott, deserving of per se treatment, determines the antitrust issue on appeal.[12]

*A. Per se Violations*

*1. Price Fixing*

That the PPP has some impact on the prices of obtaining temporary nurses is undisputed. That price fixing is equally violative of antitrust laws whether it is done by buyers or sellers is also undisputed. *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 233-37, 68 S.Ct. 996, 1005-06, 92 L.Ed. 1328 (1948). And, it is no excuse that the price "fixed" is reasonable. *FTC v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 423-24, 110 S.Ct. 768, 775, 107 L.Ed.2d 851 (1990). But whether the per se rule should apply "is not a question simply of

---

[12]If we decide the PPP is deserving of per se treatment the case ends; plaintiffs-appellants must win. But if we decide that conduct such as the establishment of the PPP does not rise to the level of anti-competitiveness necessary to hold it per se illegal, the rule of reason applies; and we will defer to the determination of the jury—that plaintiffs-appellants failed to establish the relevant market in which to judge the PPP's reasonableness.

determining whether two or more potential competitors have literally "fixed' a "price.' " *BMI,* 441 U.S. at 9, 99 S.Ct. at 1556-57.

Plaintiffs-appellants argue that the intent of the PPP was to stabilize prices and that such intent makes this practice a per se violation.  But anticompetitive effects—not intent—is the focal point of antitrust legislation.  The question is not did defendants intend to fix prices, but instead whether the PPP did so.  In defining "price fixing" the Supreme Court wrote in these terms:

> That price-fixing includes more than the mere establishment of uniform prices is clearly evident....  [P]rices are fixed ... if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform....  They are fixed because they are agreed upon.

*United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 222-23, 60 S.Ct. 811, 843-44, 84 L.Ed. 1129 (1940).  In forming the PPP, the hospitals, among themselves, never agreed to a uniform price, to an acceptable price range,[13] or to a scale for determining price.

The PPP has an impact on price;  all preferred agencies contracting with the hospitals will, to some degree, be tied into a set price for their services.  But this point of law must be remembered: "Not all arrangements among actual or potential competitors that have an impact on price are per se violations of the Sherman Act or even unreasonable restraints." *BMI,* 441 U.S. at 23, 99 S.Ct. at 1564.  And, it cannot be forgotten that market fluctuations could result in a preferred agency's exercise of the escape clause—allowing that agency to reenter the market free to charge the prices it chooses.  Most important, this case involves lots of distinct contracts.  A pricing agreement of some kind is necessary in the contracting for goods and services;  and competitive bidding is an acceptable way to decide with whom the hospitals wish to contract.

---

[13]That the SFHA—when it requested bids—suggested a price range to the participating agencies does not create an agreement on the prices they would accept.  As shown by the accepted bids, prices outside the range were acceptable.

Earlier Supreme Court cases were faced with more direct price fixing, which led to the per se categorization of such schemes. In the context of a blatant agreement to fix prices,

> [i]t makes no difference whether the motives of the participants are good or evil; whether the price fixing is accomplished by express contract or by some more subtle means; whether the participants possess market control; whether the amount of interstate commerce affected is large or small; or whether the effect of the agreement is to raise or to decrease prices.

*United States v. McKesson & Robbins, Inc.,* 351 U.S. 305, 310, 76 S.Ct. 937, 940, 100 L.Ed. 1209 (1956). But we do not have an agreement to fix prices in this case: no prices were preset for nursing services.

The Supreme Court has recently taken another step away from per se treatment, particularly in maximum vertical price fixing arrangements.[14] *See State Oil Co. v. Khan,* --- U.S. ----, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). Vertical price fixing is no longer a per se violation. *Id.* at ----, 118 S.Ct. at 278.

The key to per se treatment is whether the conduct is of the kind that can only be anticompetitive. But, the PPP, arranged by the SFHA and the Palm Beach County hospitals, is not inherently an anticompetitive practice. No temporary nursing agency was precluded from competing to become a preferred agency. Also, all agencies are still able to provide nurses to medical facilities other than hospitals and even to hospitals should the need for nurses not be met by the preferred agencies. Although the PPP may stabilize prices to some degree, it is not the kind of "stabilization" that can be viewed as price fixing, especially when the escape clauses in the contracts are taken into account. These escape clauses allow the market and not the SFHA to be the ultimate decisionmaker for each hospital and each agency on the issues of price, demand, supply, and terms of dealing.

---

[14]The alleged attempt to fix prices by the hospitals' agreement with each other would be horizontal—an agreement among competitors. The alleged attempt to fix prices by the hospitals' agreements with the preferred agencies would be vertical.

## 2. Group Boycotts

The same principles apply to a consideration of application of the per se rule whether the act complained of is labeled price fixing or a group boycott. "[T]he recent jurisprudence of the Supreme Court and of the Court of Appeals of this Circuit cautions against the haphazard expansion of the "group boycott label' and the concomitant imposition of per se liability." *Retina Assocs.,* 105 F.3d at 1381. "Not all concerted refusals to deal are predominantly anticompetitive." *Northwest,* 472 U.S. at 298, 105 S.Ct. at 2621. In cases of group boycotts where the per se rule has been applied, "the boycott often cut[s] off access to a supply, facility, or market *necessary to enable the boycotted firm to compete, ...* and frequently the boycotting firms possessed a *dominant position in the relevant market.*" *Id.* at 294, 105 S.Ct. at 2619 (emphasis added).

In dealing with group boycott situations, market analysis has found its way into the determination of whether a given practice should be per se illegal. No longer is relevant market a factor only after it has been decided that the rule of reason applies. "Unless the cooperative possesses market power or exclusive access to an element essential to effective competition, the conclusion that [the conduct] is virtually always likely to have an anticompetitive effect is not warranted." *Northwest,* 472 U.S. at 296, 105 S.Ct. at 2620-21.

In this case, no refusal to deal has been shown. All agencies were able to participate in the bidding to become preferred providers, and generally a hospital will still deal with any nursing agency when the preferred agencies with which the hospital has contracted for nursing services fail to meet its needs. The record shows, in fact, that more than a trifling portion of hospital nursing business in Palm Beach County continued to go to nonpreferred agencies after the PPP was in operation. Also, due to the rise in HMOs, home care, and similar trends in the medical world, facilities other than hospitals provide the market, the supply, and the facilities necessary for

nonpreferred agencies to compete with each other and with preferred agencies in the marketplace.

Per se treatment has been given to those practices which history has shown have only anticompetitive effects. "[A]nalyzing this case under the per se rubric would remain inappropriate absent some demonstration that the practice at issue historically leads to anticompetitive effects in the market." *Retina Assocs.,* 105 F.3d at 1381. No history of this kind seems to exist for health-care preferred-provider programs materially similar to what we have before us now.

We conclude, based upon undisputed facts, that the practice of this PPP is not deserving of per se treatment and was properly evaluated under the rule of reason.

*B. Rule of Reason*

The rule of reason requires "the factfinder [to weigh] all of the circumstances of the case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). The rule of reason should be applied to practices designed to "increase economic efficiency or render markets more, rather than less, competitive." *BMI,* 441 U.S. at 19-20, 99 S.Ct. at 1562-63; *see also Northwest,* 472 U.S. at 289-90, 105 S.Ct. at 2616-17.

"[T]o satisfy the rule of reason, the plaintiff must prove that the [conduct] had an adverse effect on competition." *Coffey v. Healthtrust, Inc.,* 955 F.2d 1388, 1392 (10th Cir.1992). But, competition occurs only in a market. Thus, "before we can reach the larger question of whether [defendants] violated any of the antitrust laws, we must confront the threshold problem of defining the relevant market." *Thompson v. Metropolitan Multi-List, Inc.,* 934 F.2d 1566, 1572 (11th Cir.1991).[15]

---

[15]Because this case is subject to the rule of reason and because of the importance of relevant market and market power in evaluating the reasonableness of a purported restraint, the district court's jury instructions and interrogatories directing that the jurors must find for defendants if

Interrogatories went to the jury.[16] The jury found that plaintiffs-appellants failed to establish the relevant market. Because no definable market was proved, plaintiffs could show no adverse effect on competition. Plaintiffs-appellants try to debate the required showing of market power. But their argument is based upon per se treatment of the antitrust claim. Because we have decided, as did the district court, that the PPP triggers no per se analysis, relevant market was critical to plaintiffs-appellants' claims.

The jury found that no relevant market was shown; and we will reverse the jury's determination on this factual issue only if it is clearly erroneous. *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 381, 76 S.Ct. 994, 999, 100 L.Ed. 1264 (1956). We cannot say the finding that no relevant market was established is clearly erroneous. The failure to establish the relevant market (either by product or geography) was fatal to plaintiffs-appellants' antitrust claims. So, we accept the jury verdict against them.

AFFIRMED.

WELLFORD, Senior Circuit Judge, concurring:

I concur in Judge Edmondson's opinion. The antitrust issues were addressed early in this case through a decision on setting aside a preliminary injunction in and expanded on in a concurring opinion authored by then Chief Judge Tjoflat, 887 F.2d 1535, 1539 (11th Cir.1989) (Tjoflat, C.J., concurring).

There were contested issues as to whether defendants possessed market power in a relevant market for temporary nursing services. The jury decided the contested relevant issue on which

---

plaintiffs failed to establish the relevant market were proper applications of the law governing this case.

[16]The interrogatories, among other things, directed the jury to find for the defendants if the plaintiffs did not establish the necessary relevant market.

plaintiffs had the burden. There were contested issues as to whether defendants had monopoly "control over access to an essential element of competition" by means of the arrangement. Plaintiffs had the burden to prove this and they failed in this burden.

Judge Edmondson points out, as Judge Tjoflat previously did in this case, that *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), is key, and it "prohibits the application of the per se rule to cooperative buying arrangements unless a court has made certain preliminary findings of fact." *Id. Northwest* held that "[a]bsent a showing [of market power or *exclusive access* to an element essential to effective competition] with respect to a cooperative buying arrangement, courts should apply a rule-of-reason analysis." *Northwest,* 472 U.S. at 297, 105 S.Ct. at 2621, *quoted in All Care Nursing Service,* 887 F.2d at 1539; *see also* Areeda & Havenkamp, *Antitrust Law* (1989 Supp.) ¶ 1511 (discussing *Northwest* and suggesting that plaintiffs must establish market power of defendant before the court should finally decide *per se* or rule of reason application).

In addition, this circuit has indicated that "[t]he presumption in cases brought under section 1 of the Sherman Act is that the rule-of-reason standard applies." *Seagood Trading Corp. v. Jerrico, Inc.,* 924 F.2d 1555, 1567 (11th Cir.1991). We observed in that case, moreover, that "[t]he Supreme Court has made it clear that the per se label should be applied infrequently and with caution." *Id.*

The majority opinion has covered all of the questions in this case; I merely emphasize the application of the rule-of-reason principle under the circumstances.