# In the
# United States Court of Appeals
## For the Seventh Circuit

————————

Nos. 02-4151 & 02-4241

ROBERT PETIT et al.,

*Plaintiffs-Appellants,*
*Cross-Appellees,*

v.

CITY OF CHICAGO, a municipal corporation, et al.,

*Defendants-Appellees,*
*Cross-Appellants.*

————————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 90 C 4984 & 91 C 668—**William T. Hart**, *Judge.*

————————

ARGUED SEPTEMBER 10, 2003—DECIDED DECEMBER 15, 2003

————————

Before BAUER, MANION, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Eighteen years ago, the Chicago Police Department (CPD) conducted an examination that for a fairly brief moment in time formed the basis for promotions of patrol officers to the rank of sergeant. After the examination the raw scores were standardized, most relevantly here for race and ethnicity. What followed was this lawsuit alleging that promotions resulting from the exam violated the plaintiffs' rights under the Equal Protec-

tion Clause of the United States Constitution. Today, odd as it may seem, we must evaluate the hoary examination based on the standards set out just this year by the United States Supreme Court in two affirmative action cases involving student admissions at the University of Michigan.

This lawsuit itself stirred to life in 1988 when some of the plaintiffs tried to intervene in another case—*United States v. City of Chicago* (C.A. 73 C 2080, N.D. Ill.). When their attempt was rejected, they filed this case in 1990. The original plaintiffs were 326 nonminority Chicago police officers who took the 1985-88 promotional examination for the rank of sergeant. They alleged that the affirmative action plan implemented in connection with that examination deprived them of the equal protection of the law. The City defended the promotions based on the plan on the grounds that (1) they were necessary to maintain the operational effectiveness of the CPD; (2) they were necessary to remedy past discrimination in hiring and promotions; and (3) they were necessary to avoid a claim that the City's past policies were a violation of Title VII under an "adverse impact" theory.

The case was consolidated for discovery with five other cases challenging various CPD promotions. Along the way, all plaintiffs except 82 have been dismissed for lack of standing. In addition, the doctrine of collateral estoppel has been applied to preclude plaintiffs from relitigating certain issues decided in *Majeske v. City of Chicago*, 218 F.3d 816 (7th Cir. 2000). Those issues were that, during the decades prior to 1989, the City subjected African-American police officers to unfavorable treatment in assignments, subjected both African-American and Hispanic officers to unfavorable treatment in hiring and to hostile treatment, and that the CPD tolerated the hostile treatment. Ultimately the case went to trial on issues of liability. The jury was asked to make findings on 95 special interrogatories. It answered five. The jurors found that each of the five times the City

made promotions using the 1985-88 exam results, it had a compelling interest in remedying the effects of past discrimination against Hispanics. In February 2002, because the jury did not reach a complete verdict, a mistrial was declared.

The parties then filed motions pursuant to Rule 50 of the Federal Rules of Civil Procedure. Because not all issues could be resolved through a decision on the Rule 50 motions, and because the City claimed that the plaintiffs had not preserved certain issues raised in their Rule 50 motion, the district judge considered the motions as "summary judgment motions to the extent they raise issues not properly preserved for a Rule 50 motion or rely on evidence not presented at trial." In other words, the entire record was before the district judge when he granted summary judgment for the City based on its claim that the police department had an operational need to engage in affirmative action and that the action it took was narrowly tailored to meet that need. Neither party has raised serious objections to this rather unusual procedure, and our independent evaluation reveals that the record contains undisputed facts which allow a final disposition of this claim. In this appeal the plaintiffs raise several issues, but only a few require discussion.

One issue we may quickly dispatch is whether a large number of plaintiffs were properly dismissed. The first time dismissal of these plaintiffs was requested, the request was denied, but upon reconsideration, after *Texas v. Lesage*, 528 U.S. 18 (1999), dismissal was ordered of all but 82 plaintiffs.[1] In *Lesage,* the Court held that dismissal of equal protection claims brought by rejected applicants to a state university doctoral program was proper because it was undisputed that the applicants would have been rejected

---

[1]  This is not a class action. All plaintiffs are named.

regardless of any alleged discrimination. In that situation there is "no cognizable injury warranting relief . . . ." At 21. Similarly, the dismissed plaintiffs in this case would not have been promoted regardless of any standardization of test results and so have no cognizable injury. We find that the dismissal was proper.

The plaintiffs also argue that the collective bargaining agreement (CBA) between the City and the Fraternal Order of Police prohibits the affirmative action plan involved in this case. The CBA says:

> [E]mployment related decisions will be based on qualifications and predicted performance in a given position, without regard to race . . . sex . . . or national origin . . . .

This issue was raised for the first time at the close of evidence at trial on a motion for directed verdict—that is, about 12 years into the case. The district judge found that the issue had not been properly preserved for purposes of the Rule 50 motion, but because of the mistrial he allowed the parties to raise issues—not otherwise waived or dismissed in pretrial proceedings—in summary judgment motions or Rule 50 motions converted to summary judgment motions.

We will set aside consideration whether the controversy must first be arbitrated as required by the CBA or whether the contract excludes promotions to sergeant on the basis that those positions are outside the bargaining unit because there is a more compelling reason why the arguments fail. As we shall soon see, the affirmative action promotions in this case do not violate the Equal Protection Clause.

We turn, then, to the dispositive issue: the City's defense that the procedures used met an operational need of the police department. Like any racial preference, this one must

be justified by a compelling state interest. *Adarand Constructors, Inc. v. Pena*, 515 U.S. at 227 (1995). In *Grutter v. Bollinger*, 123 S. Ct. 2325 (2003), one of the University of Michigan cases we alluded to at the beginning of this opinion, the Court endorsed the view that "student body diversity is a compelling state interest that can justify the use of race in university admissions." At 2337. In arriving at that conclusion, the Court deferred to the law school's educational judgment that "such diversity is essential to its educational mission . . . ." The goal of the law school was to assemble a class that was "exceptionally academically qualified and broadly diverse," and as part of that goal it sought to enroll a "critical mass" of minority students. At 2339. The Court found that the benefits of diversity were substantial, for which proposition it relied in part on the views of high-ranking retired officers and civilian leaders of the United States military to the effect that a "highly qualified, racially diverse officer corps . . . is essential to the military's ability to fulfill its principle mission to provide national security." At 2340. Furthermore, in the Court's words, the "[e]ffective participation by members of all racial and ethnic groups in the civic life of our Nation is essential if the dream of one Nation, indivisible, is to be realized." At 2340-41. The conclusion was that the "Law School has a compelling interest in attaining a diverse student body." At 2339.

It seems to us that there is an even more compelling need for diversity in a large metropolitan police force charged with protecting a racially and ethnically divided major American city like Chicago. Under the *Grutter* standards, we hold, the City of Chicago has set out a compelling operational need for a diverse police department.

In *Grutter*, the Court noted that its holding was in "keeping with our tradition of giving a degree of deference to a university's academic decisions, within constitutionally prescribed limits." At 2339. Similarly, we believe that it

is proper in this case to rely on the views of experts and Chicago police executives that affirmative action was warranted to enhance the operations of the CPD. In fact, prior to *Grutter* we stated that we "left open a small window for forms of discrimination that are supported by compelling public safety concerns, such as affirmative action in the staffing of police departments . . . ." *Reynolds v. City of Chicago*, 296 F.3d 524, 530 (7th Cir. 2002).

In this case, the City presented a strong basis to conclude that some rather modest affirmative action promotions were necessary for the effective operation of the police department. Professor Samuel Walker, an expert in criminal justice and police-community relations, testified that all major studies conducted since the 1960's recognized the importance of minority representation. The reality of urban policing is that minorities are frequently mistrustful of police and are more willing than nonminorities to believe that the police engage in misconduct. Walker also described the results of a survey he conducted to measure the perceptions and attitudes of Chicago residents about minority supervisors. He found that among Chicagoans, nonminorities have more favorable opinions about the CPD than do minorities. Distrust and a lack of confidence in the police, in turn, reduce the willingness of some community members to cooperate with the police. On the other hand, when police officers are routinely supervised by minorities, the fears that the police department is hostile to the minority community will naturally abate. Walker's conclusion was that an increase in minorities enhanced the public's perception of the CPD, which in turn enhanced the department's ability to prevent and solve crime.

A former chief of the Portland (Oregon) Police Bureau, Tom Potter, testified to the necessity of diversity among police supervisors, both for the community's perceptions of police departments, but also internally in changing the at-

titudes of officers. Additionally, a number of high-ranking CPD officials confirmed the need for diversity at the sergeant rank and that sergeants are in a unique position to influence officers on the street. These officials testified that the presence of minority sergeants has not only improved police-community cooperation, but also diffused potentially explosive situations, such as the tense racial situation following riots in the 1980's in a predominately Hispanic community. These officials also recounted the growth in the minority population of the City and the fact that minority representation at the sergeant rank had not kept pace with that growth.

We have previously recognized that a visible presence of minorities in supervisory positions is critical to effective policing in a racially diverse city like Chicago because supervisors "set the tone for the department." Equally important, the presence of minority supervisors is an important means of earning the community's trust: "Effective police work, including the detection and apprehension of criminals, requires that the police have the trust of the community and they are more likely to have it if they have 'ambassadors' to the community of the same [race or] ethnicity." *Reynolds*, 296 F.3d at 529. In another case involving promotions to sergeant, we found that "[t]he composition and operation of an effective police force should be in as complete harmony as possible with the community from which it springs." *United States v. City of Chicago*, 663 F.2d 1354, 1364 (7th Cir. 1981) (en banc).

All in all, we find that, as did the University of Michigan, the Chicago Police Department had a compelling interest in diversity. Specifically, the CPD had a compelling interest in a diverse population at the rank of sergeant in order to set the proper tone in the department and to earn the trust of the community, which in turn increases police effectiveness in protecting the city.

This does not end our inquiry, however, for "[e]ven in the limited circumstance when drawing racial distinctions is permissible to further a compelling state interest, government is still 'constrained in how it may pursue that end: [T]he means chosen to accomplish the [government's] asserted purpose must be specifically and narrowly framed to accomplish that purpose.'" *Grutter*, 123 S. Ct. at 2341, quoting *Shaw v. Hunt*, 517 U.S. 899, 908 (1996). It is here that *Grutter* and the other University of Michigan case—*Gratz v. Bollinger*, 123 S. Ct. 2411 (2003)—diverge. The system for undergraduate admissions at issue in *Gratz* was rejected because it was not narrowly tailored and, for that reason, violated the Equal Protection Clause. The method used by the university was automatically to assign 20 points—or one-fifth of the 100 points need to guarantee admission—to each underrepresented minority applicant solely because of race. The system, which made race the deciding factor for every minimally qualified minority applicant, was found not to be narrowly tailored. On the other hand, the system at the Michigan Law School as described in *Grutter* was constitutional. Rejecting "mechanical, predetermined diversity 'bonuses,'" the Court emphasized that race must be used in "a flexible, nonmechanical way." A race-conscious admissions program cannot use a quota system. It cannot "insulat[e] each category of applicants with certain desired qualifications from competition with all other applicants.'" *Grutter*, 123 S. Ct. at 2343. However, race can be a "'plus' factor in the context of individualized consideration of each and every applicant." *Id.* at 2342. In addition, a program must not unduly harm members of any racial group and must "work the least harm possible to other innocent persons competing for the benefit." *Id.* at 2345, quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 308 (1986). Finally, the program must be limited in time; that is, not enshrined as a permanent justification for racial preferences.

In the mid-1980's, when the CPD determined that it would make approximately 500 promotions of patrol officers to the rank of sergeant, it formulated an examination procedure, which any patrol officer was eligible to take and anyone who sought a promotion had to take. The promotions were to be made according to rank order of the scores. A total of 3,416 officers took the examination— 2,274 white officers (and in a somewhat bizarre move, Asians, American Indians, and other smaller ethnic groups were thrown into the white category); 931 African-Americans; and 192 persons classified as Hispanic.

The examination consisted of four parts, with the following weights: a written multiple choice test administered in 1985 (28%); a written short answer test administered in 1988 (29%); an oral examination also administered in 1988 (40%); and performance evaluations (3%). The points added up to a total possible score of 100.

As recounted by Robert T. Joyce of the City of Chicago Department of Personnel, the results were evaluated by employees of his department. For the subjective parts of the test—the written short answers and the oral examination, the City standardized the scores to eliminate differences resulting from the differences in grading among the different persons doing the grading. The results, after this standardization, showed that the test had an adverse impact on African-Americans and Hispanics and would have resulted in far too few promotions to persons in those categories. As we noted, there were 458 officers promoted. Using these test results, only 60 would have been African-American and only 15 would have been Hispanic.

At the time the examination was being formulated, the City had experience with two prior examinations for the rank of sergeant and, more importantly, was under a federal court order not to promote officers on rank-order examinations unless it could document the test's validity as

a rank order promotional device. In other words, to use the results as they stood, the City would have had to show that a higher score would result in better performance as a sergeant. But this test was not validated, and, in fact, the City explains that it would be extremely difficult to validate such a test. Furthermore, analysis showed that there was a standard measure of error for the examination that was greater than three points. That meant that a person taking the test on two different days could be expected to receive a score on one day that was within plus or minus three points of the score on another day. In addition, on the 100-point scale that was used to grade the examination, the scores of a large number of candidates were too close to be distinguished from one another. Finally, in examining the process of developing the test, the City found that white and African-American sergeants differed as to the relative importance of various sergeant duties. Seventy percent of the sergeants who participated in the job analysis were white, so that the test was created from data that tended to reflect the views of the white sergeants.

For those reasons, through a rather complicated procedure, the City standardized the scores based on race. As Mr. Joyce explains it, standardization is a recognized statistical method of removing differences between the scores of two or more groups of test-takers. If, for instance, two different groups have different mean scores, and there is no objective reason to assume the two groups should have scored differently, standardization is an acceptable method of equalizing the scores. The process was an attempt to produce results that reflected the score a candidate would have received if the test had not had an adverse racial impact. The standardized scores were then used to place the candidates in rank order.

Given the margin of error and the fact that the test was not validated, these candidates, both before and after

standardization, were fairly uniformly qualified for promotion. In fact, according to the examination results, it would appear that all of the candidates who were promoted, and many who were not promoted were qualified for promotion. The passing score on the examination was 70, and approximately 2000 of the candidates passed. The result of the standardization was that, of the top 500 officers, 332 were white, 138 were African-American, and 30 were Hispanic. The score of the 332nd white candidate in the pool of 500 eligible candidates was 82.98; the unstandardized score of the 138th African-American candidate was 80.70 and the standardized score was 82.82; the unstandardized score of the 30th Hispanic candidate was 80.95 and the standardized score was 83.43. The differences are within the margin of error. Based on the examination results, the City made standardized rank-order promotions of 402 candidates—298 were white; 119 were African-American; and 41 were Hispanic. In addition, 56 out-of-rank-order promotions were made. It cannot be said that the process affected every "minimally qualified" candidate as did the blanket award of 20 points per candidate, the procedure found to be unconstitutional in *Gratz*. In fact, standardizing the scores can be seen not as an arbitrary advantage given to the minority officers, but rather as eliminating an advantage the white officers had on the test.

The ultimate result was that of the 82 plaintiffs to this action, some had their promotions delayed and approximately 50 were not promoted. While we do not minimize the loss that those who were not promoted suffered, we find that the procedures met the *Grutter* standard for minimizing harm to members of any racial group.

Furthermore, the results of this examination were not used after 1991, and no race-conscious promotions have been made since that time. We are told that, in fact, new examinations have been held in 1993, 1998, and 2002. The affirmative action plan at issue in this case was limited in time, as *Grutter* also requires.

Faced with a very difficult situation, we find that the City formulated a plan in the 1980's which meets the standards enunciated in 2003. The judgment of the district court is AFFIRMED.

A true Copy:
  Teste:

_____
***Clerk of the United States Court of***
***Appeals for the Seventh Circuit***